ASSET PURCHASE AGREEMENT

BY AND BETWEEN

JANET NORTHRUP

CHAPTER 11 TRUSTEE

OF GOODCRANE CORPORATION

AS SELLER

AND

EZRAM ENTERPRISE LLC

AS BUYER


EFFECTIVE AUGUST 31, 2010

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### DEFINITIONS

Section 1.1    Definitions.................................................................................. 1
Section 1.2    Headings, Interpretation, Etc ......................................................... 8

## ARTICLE II
### PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase and Sale of Assets............................................................ 8
Section 2.2    Title Commitment/Survey ............................................................ 11

## ARTICLE III
### NO ASSUMPTION OF LIABILITIES

Section 3.1    Assumption and Exclusion of Liabilities ........................................ 11

## ARTICLE IV
### PURCHASE PRICE

Section 4.1    Purchase Price............................................................................ 11
Section 4.2    Prorations ................................................................................. 11
Section 4.3    Allocation of the Purchase Price .................................................. 12

## ARTICLE V
### THE CLOSING

Section 5.1    Time and Place of Closing ........................................................... 12
Section 5.2    Deliveries by Seller..................................................................... 13
Section 5.3    Deliveries by Buyer .................................................................... 13
Section 5.4    Intentionally Omitted .................................................................. 14

## ARTICLE VI
### REPRESENTATIONS AND WARRANTIES OF SELLER

Section 6.1    Authorization, No Conflicts, Etc. ................................................. 14
Section 6.2    Consents and Approvals ............................................................... 14
Section 6.3    Title to Assets and Properties; Liens ............................................. 15
Section 6.4    Material Facts............................................................................. 15
Section 6.5    FIRPTA Certification................................................................... 15

## ARTICLE VII
### REPRESENTATIONS AND WARRANTIES OF BUYER

Section 7.1    Due Organization, Etc.................................................................. 15
Section 7.2    Authorization, Etc........................................................................ 15
Section 7.3    Consents and Approvals ............................................................... 16

143269_1.DOC

i

## ARTICLE VIII
## COVENANTS

Section 8.1    Conduct of Business ................................................................................. 16
Section 8.2    Access ....................................................................................................... 17
Section 8.3    Bankruptcy Filings and Auction Procedures. ......................................... 17
Section 8.4    Commercially Reasonable Efforts ........................................................... 19
Section 8.5    Filings with Governmental Entities; Permits and Licenses ................... 19
Section 8.6    Tax Matters .............................................................................................. 19
Section 8.7    Amounts Received and Paid to Seller After Closing ............................... 19
Section 8.8    Further Assurances................................................................................... 20
Section 8.9    Intentionally Omitted ............................................................................... 20
Section 8.10   Books and Records .................................................................................. 20
Section 8.11   Notice of Sale........................................................................................... 21

## ARTICLE IX
## CONDITIONS

Section 9.1    Conditions to Seller's Obligations .......................................................... 21
Section 9.2    Conditions to Buyer's Obligations........................................................... 22

## ARTICLE X
## TERMINATION

Section 10.1   Termination............................................................................................... 23
Section 10.2   Procedure and Effect of Termination....................................................... 24

## ARTICLE XI
## MISCELLANEOUS

Section 11.1   Successors and Assigns............................................................................. 25
Section 11.2   Notices ..................................................................................................... 25
Section 11.3   Expenses; Transfer Taxes ........................................................................ 26
Section 11.4   Entire Agreement..................................................................................... 27
Section 11.6   "AS IS/WHERE IS" SALE ...................................................................... 27
Section 11.7   Waiver ...................................................................................................... 27
Section 11.10  Amendment............................................................................................... 28
Section 11.11  Counterparts; Facsimile Signatures ......................................................... 28
Section 11.12  Choice of Law .......................................................................................... 28
Section 11.13  Jurisdiction; Consent to Service of Process ............................................. 28
Section 11.14  Damage or Destruction ............................................................................ 29
Section 11.15  Condemnation ........................................................................................... 29

**Schedules**

Schedule 2.1(a)(i) – Purchased Assets – Assumed Leases
Schedule 2.1(a)(ii) – Purchased Assets – Purchased Contracts
Schedule 2.1(a)(v) – Purchased Assets – Purchased/Excluded Vehicles
Schedule 6.3 – Titled Purchased Assets

**Exhibits**

Exhibit A – Stipulation and Order
Exhibit B – Bidding Procedures Motion and Bidding Procedures Order
Exhibit C – Sale Motion and Sale Order
Exhibit D – Form of Bill of Sale
Exhibit E – Form of Assignment and Assumption Agreement
Exhibit F – Form of Special Warranty Deed

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, effective as of August 31, 2010, is by and between Janet Northrup ("Seller"), acting solely in her capacity as the duly appointed Chapter 11 Trustee of Goodcrane Corporation, a Texas corporation ("Debtor"), and EZRAM Enterprise LLC ("Buyer").

## RECITALS

A.      Debtor has previously filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), Case No. 09-34031-H4-11; *In re Goodcrane Corporation* (the "Bankruptcy Case").

B.      Seller has obtained the approval of the Bankruptcy Court to sell the Purchased Assets as evidenced by and in accordance with the Bidding Procedures Order attached hereto as Exhibit B.

C.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 105 and 363 of the Bankruptcy Code and by the Bidding Procedures Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of the Purchased Assets (as hereinafter defined).

D.      In furtherance of the terms of the Stipulation and Order Regarding Commercial Real Properties entered by the Bankruptcy Court on November 13, 2009, a copy of which is attached to this Agreement as Exhibit A (the "Stipulation and Order") and in order to transfer Seller's interest in any other Titled Purchased Assets (as defined below) the title to which is governed by filing in the public records, Seller shall cause the ABC&P Parties (as defined below) to execute and deliver such documents as may be requested or required by Buyer or a title company to accomplish the sale of the Titled Purchased Assets; *provided, however* that should the ABC&P Parties refuse to execute and deliver any document requested or required by Buyer or a title insurance company to accomplish the sale of the Titled Purchased Assets, Seller shall obtain Bankruptcy Court authority to execute such documents on behalf of the ABC&P Parties pursuant to Fed. R. Civ. P. 70 and Fed. R. Bkr. P. 7070 (as a separate order of the Bankruptcy Court or to be included in the Sale Order (as defined below), the "Rule 70 Order"), and Buyer and the title insurance company shall accept such document(s) executed by Seller as authorized by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1      Definitions. As used in this Agreement, the following terms have the following meanings:

"ABC&P Parties" means ABC&P, LLC, and Benjamin B. Almeda, Jr., Corazon B. Almeda, Patrick Almeda, Maria Victoria Almeda, Benjamin B. Almeda, III, and Nancy J. Almeda.

"Affiliate" of any Person means any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person; and, for the purposes of this definition only, "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management, policies or activities of a Person whether through the ownership of securities, by contract or agency or otherwise.

"Agreement" means this Asset Purchase Agreement, including the Exhibits and the Schedules attached hereto.

"Almeda Deed" means the Special Warranty Deed relating to the land commonly known as 12221 Almeda Road, Houston, Texas, in substantially the form attached hereto as Exhibit F.

"Allocation" has the meaning set forth in Section 4.3(a).

"Alternative Agreement" means any agreement for an Alternative Transaction.

"Alternative Buyer's Deposit" has the meaning set forth in the Bidding Procedures Order.

"Alternative Transaction" has the meaning set forth in Section 8.3(b), and specifically excludes consummation of the sale from Seller to Offshore Energy Holding, L.L.C. previously approved by the Bankruptcy Court [Docket No. 363].

"Ancillary Agreements" means the Assignment and Assumption Agreement, the Bill of Sale, the Real Property Deeds and all other instruments, certificates, and other agreements contemplated by this Agreement that are entered into by the Parties or their respective Affiliates in connection with the Transaction.

"Auction" means an auction for the sale of the Purchased Assets held by the Bankruptcy Court and conducted in accordance with the terms of the Bidding Procedures Order.

"Assignment and Assumption Agreement" means an Assignment and Assumption Agreement entered into between Seller and Buyer in the form attached hereto as Exhibit E relating to the Purchased Contracts and the Post-Agreement Contracts.

"Assumed Leases" has the meaning set forth in Section 2.1(a)(i).

"Back-Up Bid" has the meaning set forth in the Bidding Procedures Order.

"Bankruptcy Case" has the meaning set forth in Recital A.

"Bankruptcy Code" has the meaning set forth in Recital A.

"Bankruptcy Court" has the meaning set forth in Recital A.

"Bid Deadline" means the deadline established under the Bidding Procedures Order for the submission of competing bids by third parties.

"Bidding Procedures Motion" shall mean the motion in the form attached hereto as Exhibit B to be filed by Seller with the Bankruptcy Court seeking, among other things, entry of the Bidding Procedures Order.

"Bidding Procedures Order" means an order of the Bankruptcy Court approving the procedures relating to the auction of the Purchased Assets in the form of Exhibit B, with only such changes thereto as Buyer agrees in its sole discretion.

"Bill of Sale" means a Bill of Sale relating to the Purchased Assets in the form attached hereto as Exhibit D.

"Break-Up Fee" has the meaning set forth in Section 8.3(e).

"Buyer" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day, other than a Saturday, Sunday or legal holiday (as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure).

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 5.1.

"Closing Cash Consideration" has the meaning set forth in Section 4.1.

"Closing Date" means the first Business Day after the Sale Order has become a Final Order and after the satisfaction or waiver of all of the conditions set forth in Article IX (other than those conditions that by their terms are to be satisfied at the Closing), unless otherwise agreed by the parties.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Contracts" means all contracts, agreements and other arrangements, whether oral or written.

"Crane Contracts" means collectively (i) the Memorandum of Understanding [Docket No. 117] concerning Contract No. 08033-022508 dated as of February 26, 2008, between Oceanografia, S.A. de C.V. and Debtor, which contract was assigned by Oceanografia, S.A. de C.V. to CVI Global Lux Oil and Gas S.Á.R.L. pursuant to the terms of that certain Assignment and Assumption Agreement dated as of August 8, 2008, between Oceanografia, S.A. de C.V. and CVI Global Lux Oil and Gas S.Á.R.L., (ii) the Memorandum of Understanding [Docket No. 88] concerning the Purchase Contract dated as of February 9, 2009, between Stabbert Maritime and Debtor, (iii) the Memorandum of Understanding [Docket No. 154] concerning the Crane Construction Agreement dated as of March 18, 2009, between Otto Candies, LLC and Debtor, and (iv) the Memorandum of Understanding [Docket No. 292] dated as of March 15, 2010,

143269_1.DOC

between Seller and Otto Candies, LLC, as each of the foregoing has been amended, supplemented, and modified, provided such amendment, supplementation or modification has been approved by the Bankruptcy Court.

"Debtor" has the meaning set forth in the preamble to this Agreement.

"Debtor's Estate" means the estate created upon the filing by Debtor of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code, together with all rights, claims and interests pertaining thereto.

"Deposit" has the meaning set forth in the Bidding Procedures Order.

"Estate Transferring Party" means any of Seller, Debtor, and Debtor's Estate.

"Excluded Assets" has the meaning set forth in Section 2.1(b).

"Final Order" shall mean (i) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari or motion for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings or motion for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, motion for reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or motion for reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or motion for reargument or rehearing shall have expired.

"Governmental Entity" means any domestic or foreign governmental or regulation authority, including any department, commission, board, bureau, agency or instrumentality of such authority or any court or tribunal.

"Highest and Best Bid" has the meaning set forth in the Bidding Procedures Order.

"Improvements" shall mean all buildings, structures, cranes, towers, lifts, and other improvements situated upon the Land and any fixtures, systems and facilities owned by Seller and located on the Land.

"Intellectual Property" means (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, together with the goodwill associated with any of the foregoing, and all applications and registrations for the foregoing, including all renewals of same, (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues, (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists, (iv) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of information), including mask rights, copyrights therein and thereto, registrations and applications therefor, and all renewals, extensions,

143269_1.DOC

restorations and reversions thereof, and (v) any other intellectual property or proprietary rights including, but not limited to, the intellectual property listed on <u>Schedule 6.3</u> hereto.

"<u>International Locales</u>" means (i) Europe (which is limited to Austria, Belgium, Bulgaria, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Liechtenstein, Luxembourg, Monaco, the Netherlands, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, Switzerland, Turkey, and the United Kingdom); (ii) Australia; (iii) Canada; (iv) Indonesia; (v) Japan; (vi) Malaysia; (vii) the Republic of Korea (also known as South Korea); and (viii) Singapore.

"<u>Kirkgard Deed</u>" means the Special Warranty Deed relating to the land commonly known as 12268 Kirkgard Dr., Houston, Texas, in substantially the form attached hereto as <u>Exhibit F</u>.

"<u>Land</u>" shall mean the land commonly known as 12221 Almeda Road, Houston, Texas, 12218 Robin Blvd., Houston, Texas, and 12268 Kirkgard Dr., Houston, Texas, and being more particularly described in the Stipulation and Order, together with (i) all appurtenances belonging or appertaining thereto; (ii) all of the Transferring Parties' interest in and to any and all mineral rights and interests thereto; (iii) all easements and rights-of-way affecting said real property and all of the Transferring Parties' rights to use same; (iv) all rights of ingress and egress to and from said real property; (v) all right, title and interest of the Transferring Parties in and to and any and all roads, streets and ways affecting or bounding said real property; and (vi) all right, title and interest of the Transferring Parties in and to any and all strips or pieces of property abutting, bounding or which are adjacent to said real property, subject to the overlaps and encroachments noted on the Survey.

"<u>Law</u>" means any domestic or foreign statute, rule, regulation or other legal requirement.

"<u>Leases</u>" means the interest of Seller, as lessor, lessee or otherwise, in any leases, ground leases, subleases and other instruments and agreements relating to any real or personal property, together with all amendments, modifications and supplements thereto (if any), and all rights and interests of Seller relating thereto.

"<u>Lien</u>" means, as applied to any Person, any lien, charge, claim, pledge, conditional sale agreement or other title retention agreement, lease, mortgage, deed of trust, right of first refusal, security interest, option, proxy, voting trust or agreement, interest, transfer restriction or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"<u>Litigation Claims</u>" means all claims or causes of action held by the Debtor or the Seller as of the date hereof, whether or not asserted or made the subject of pending litigation, including but not limited to any claims against Offshore Energy Holding, L.L.C., its successors and/or assigns, and/or any other responsible third parties, persons, firms, corporations and/or business entities who may be held liable in connection with claims by the Debtor or the Seller for failure of Offshore Energy Holding, L.L.C. to close under the terms of the Asset Purchase Agreement approved by the Bankruptcy Court [Docket No. 363].

"<u>Memorandum of Understanding</u>" has the meaning set forth in the definition of Crane Contracts.

143269_1.DOC

"No-Shop Provisions" has the meaning set forth in Section 8.3(b).

"Offshore" means Offshore Energy Holding, L.L.C., a Delaware limited liability company, its successors and assigns.

"Permits and Licenses" has the meaning set forth in Section 2.1(a)(ix).

"Permitted Liens" means (i) statutory liens for any tax assessment or governmental charge or levy that is not overdue, (ii) those matters referenced in items 1, 2, 3, 4, 5, 6, 10(a) - (p), 10(q) - (ll) on Schedule B of the title commitment issued by Fidelity National Title Insurance Company (GF# 1017002501) dated effective as of August 15, 1010, and issued on August 20, 2010, and (iii) any liens granted in any Crane Contract.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust, union, association, Governmental Entity, tribunal, instrumentality or other entity or authority.

"Post-Agreement Contracts" has the meaning set forth in Section 2.1(a)(iii).

"Pre-Closing Period" has the meaning set forth in Section 8.1(a).

"Purchase Price" has the meaning set forth in Section 4.1.

"Purchased Assets" has the meaning set forth in Section 2.1(a).

"Purchased Contracts" has the meaning set forth in Section 2.1(a)(ii).

"Real Property Deeds" means the Almeda Deed, the Robin Deed, and the Kirkgard Deed.

"Real Property Purchased Assets" means collectively, the Land and the Improvements to be conveyed by Seller and/or the ABC&P Parties to Buyer pursuant to the Real Property Deeds in accordance with the Sale Order, the Stipulation and Order, and (to the extent applicable) the Rule 70 Order.

"Representatives" shall mean, with respect to any Person, the officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives of such Person.

"Requested Party" has the meaning set forth in Section 8.10(a).

"Requesting Party" has the meaning set forth in Section 8.10(a).

"Robin Deed" means the Special Warranty Deed relating to the land commonly known as 12218 Robin Blvd., Houston, Texas, in substantially the form attached hereto as Exhibit F.

"Rule 70 Order" has the meaning set forth in Recital D.

"Sale Motion" shall mean the motion in the form of Exhibit C to be filed by Seller with the Bankruptcy Court seeking, among other things, entry of the Sale Order.

143269_1.DOC

6

"Sale Order" means an order of the Bankruptcy Court approving the sale of the Purchased Assets to Buyer in the form of Exhibit C, with only such changes thereto as Buyer agrees in its sole discretion.

"Seller" has the meaning set forth in the preamble to this Agreement.

"Stipulation and Order" has the meaning set forth in Recital D.

"Survey" has the meaning set forth in Section 2.2.

"Tax" means any tax, levy, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount due, imposed or assessed by any Governmental Entity.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any Laws relating to any Tax.

"Terminated Leases" has the meaning set forth in Section 6.3.

"Title Commitment" shall mean a commitment for title insurance issued by the Title Company with an effective date after the date hereof, committing to insure Buyer's acquisition of fee simple title to the Real Property Purchased Assets, subject only to the Permitted Liens, in the amount of the Purchase Price pursuant to a standard form T-1, TLTA Owner Policy of Title Insurance.

"Title Company" shall mean Charter Title Company, Attention Kim LaVern, 4265 San Felipe, Houston, Texas 77027; Phone: (713) 871-9700.

"Titled Purchased Assets" has the meaning set forth in Section 6.3.

"Transaction" means the sale of the Purchased Assets and the other transactions contemplated by this Agreement.

"Transferring Party" means any of Seller, Debtor, Debtor's Estate, and the ABC&P Parties.

"Winning Bidder" has the meaning set forth in the Bidding Procedures Order.

"Working Capital Loans" means the post-petition financing facilities approved by the Bankruptcy Court's (i) Final Order Authorizing the Trustee to Incur Secured Superpriority Post-Petition Financing with Karl Winter and Granting Priority dated August 16, 2010 [Docket No. 454] and (ii) Interim Order Authorizing the Trustee to Incur Secured Superpriority Post-Petition Financing with Texas ReExcavation LC dated August 26, 2010 [Docket 474].

143269_1.DOC

7

"Working Capital Loan Proceeds Account" means a segregated, interest-bearing account established by Seller into which only the proceeds of the Working Capital Loans, and interest on the account, shall be deposited.

Section 1.2    Headings, Interpretation, Etc. Headings of the Articles and Sections of this Agreement are for the convenience of the parties only and will be given no substantive or interpretive effect whatsoever. When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule such reference will be to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein," "hereto" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person include such Person's successors and permitted assigns.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase and Sale of Assets.

(a)    Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will sell, assign, transfer, convey and deliver to Buyer, and Buyer will acquire and accept from Seller, all of Seller's right, title and interest in, to and under the properties and assets that are or were used, or held for use, by Seller and/or Debtor in the conduct of Seller's and/or Debtor's business, wherever such properties and assets are situated and of whatever kind or nature, whether tangible or intangible, real, personal or mixed, other than the Excluded Assets (collectively, the "Purchased Assets"), free and clear of all claims, encumbrances and Liens, other than Permitted Liens, including all of the Transferring Parties' right, title and interest in, to and under the following properties and assets to the extent they are not Excluded Assets:

(i)    the Leases listed on Schedule 2.1(a)(i), including real estate fixtures, leasehold improvements, security and other deposits, common-area-maintenance refunds, adjustments and other amounts payable to Seller under or in respect of such Leases (the "Assumed Leases");

(ii)    the post-petition Contracts listed on Schedule 2.1(a)(ii), including the balance of any deposits and prepaid items thereunder not applied or accrued to goods or services provided or performed by the Debtor before Closing in connection with the respective Contract (the "Purchased Contracts");

143269_1.DOC

8

(iii)    the Contracts entered into after the date hereof in compliance with Section 8.1 with Buyer's consent, which consent shall not be unreasonably withheld, including the balance of any deposits and prepaid items thereunder not applied or accrued to goods or services provided or performed by the Debtor before Closing in connection with the respective Contract (the "Post-Agreement Contracts");

(iv)    the Real Property Purchased Assets;

(v)    all tangible personal property, including any cranes, towers, lifts, equipment, machinery, trucks, cars, other vehicles and rolling stock, including the trucks and other vehicles listed on Schedule 2.1(a)(v) under the heading "Purchased Vehicles", furniture, furnishings, fixtures, trade fixtures, office materials and supplies, computers (laptop and desktop), monitors, servers, network equipment, routers, cables and computer equipment and devices;

(vi)    all inventory, work in progress, by-products, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables;

(vii)    all files, ledgers, manuals, records, reports, books of account, general, financial and Tax records, personnel records, invoices, shipping records, supplier lists, correspondence, memoranda, plats, architectural plans, surveys, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil tests, engineering reports, purchase orders, operating records, operating manuals, safety manuals, computer and software manuals, technical documentation and other printed, written or electronic materials and documents, records and files and any rights thereto;

(viii)    all credits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items;

(ix)    to the extent transferable, all municipal, state, federal and foreign franchises, permits, licenses, registrations, agreements, waivers, concessions, grants, easements, variances, exemptions, consents, approvals and authorizations, including all deposits and prepaid items in connection therewith (the "Permits and Licenses");

(x)    all sales and promotional literature, customer lists and other sales materials;

(xi)    all Intellectual Property owned, licensed or otherwise utilized by Debtor, including the rights in and to the name "Goodcrane" and similar names thereto; *provided, however*, Seller shall be obligated to prosecute only until Closing and only in the International Locales the pending applications listed on Schedule 6.3, and Buyer acknowledges that such applications in other locales may have lapsed or expired before such rights, if any then exist, are assigned to Buyer;

(xii)    all insurance policies, including recoveries and claims thereunder;

143269_1.DOC

9

   (xiii) to the extent assignable, all warranties, indemnities, guaranties and similar rights thereto (and all security therefor) from any third party;

   (xiv) all accounts receivable, notes receivable and other receivables or amounts of any kind and any and all rights which secure or guarantee payment of same;

   (xv) [intentionally omitted];

   (xvi) all cash and cash equivalents, marketable securities and negotiable instruments on hand, in lock boxes, in financial institutions or elsewhere save and except the Working Capital Loan Proceeds Account; and

   (xvii) all goodwill and other intangible assets.

   (b) <u>Excluded Assets</u>. Notwithstanding anything in <u>Section 2.1(a)</u> to the contrary, Seller will not sell, convey, assign, transfer or deliver to Buyer, and Buyer will not acquire or accept, and the Purchased Assets will not include, any of Seller's right, title or interests in, to or under the following assets (the "<u>Excluded Assets</u>"):

   (i) any Lease that is not an Assumed Lease;

   (ii) any Contract that is not a Purchased Contract or a Post-Agreement Contract;

   (iii) the trucks and other vehicles listed on <u>Schedule 2.1(a)(v)</u> under the heading "Excluded Vehicles";

   (iv) any assets held in relation to any employee benefit or welfare plan or any contract, policy or arrangement relating to any such plan;

   (v) any claim for a refund of any Tax;

   (vi) Litigation Claims, including but not limited to all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and state law made applicable by Section 544 of the Bankruptcy Code, specifically including but not limited to Adversary Proceeding No. 09-03428, including Seller's right to receive payments, return of property, or other consideration for any judgment or settlement of any such claims or causes of action;

   (vii) all claims and causes of action asserted by Seller in Adversary Proceedings Nos. 09-03318, 09-03324, 09-03332, 09-03338, 09-03487 and 10-03001 and in the adversary proceeding to be brought by Seller after the date of this Agreement pursuant to <u>Sections 6.3</u> and <u>Section 8.8(c)</u>, including Seller's right to receive payments, return of property, or other consideration for any judgment or settlement of any such claims or causes of action; *provided, however*, the conveyance of the Titled Purchased Assets to Buyer shall not be affected by Seller's claims and causes of action in any of the above referenced Adversary Proceedings; and

(viii)   the Working Capital Loan Proceeds Account.

Section 2.2   <u>Title Commitment/Survey</u>. Seller shall furnish to Buyer, within five (5) days, a copy of the Title Commitment, together with copies of all instruments referenced therein. Seller has furnished Buyer with a copy of the most recent survey of the Real Property Purchased Assets (the "<u>Survey</u>"). Seller shall pay for the cost of a title policy at closing, issued by the Title Company, on the standard form in use in the State of Texas, insuring good and indefeasible fee simple title to the Real Property Purchased Assets in Buyer, in the amount not to exceed that portion of the Purchase Price allocated to the Real Property Purchased Assets, and otherwise in a form reasonably acceptable to Buyer. Buyer shall be entitled to request that the Title Company provide such endorsements to Buyer's title insurance policy as Buyer may reasonably require; *provided* that (i) such endorsements or amendments shall be at no cost to, and shall impose no additional liability on, Seller, (ii) Buyer's obligations under this Agreement shall not be conditioned upon its ability to obtain such endorsements and, if Buyer is unable to obtain such endorsements, Buyer shall nevertheless be obligated to proceed to close the transactions contemplated hereby without reduction of or setoff against the Purchase Price, and (iii) the closing shall not be delayed as a result of Buyer's request.

## ARTICLE III
## NO ASSUMPTION OF LIABILITIES

Section 3.1   <u>Assumption and Exclusion of Liabilities</u>. Other than any liabilities associated with the Purchased Assets arising on or after the Closing Date, Buyer will not assume, cause to be assumed or be deemed to have assumed, or in any way be liable or responsible for, any liabilities or obligations of the Transferring Parties or any of their Affiliates or respective predecessors-in-interest, whether or not associated with or arising from any of the Purchased Assets or any other rights, properties or assets of the Transferring Parties and whether fixed or contingent or known or unknown. For the avoidance of doubt, Seller and Buyer agree that Buyer shall perform all future obligations of Debtor/Seller under each of the Crane Contracts <u>but</u> that Buyer is not assuming any liabilities of Debtor or Seller (i) arising from any breach of the Crane Contracts prior to the Closing Date, or (ii) otherwise arising under the Crane Contracts prior to the Closing Date.

## ARTICLE IV
## PURCHASE PRICE

Section 4.1   <u>Purchase Price</u>. In consideration of the transfer by Seller to Buyer of the Purchased Assets, Buyer will deliver to Seller at the Closing the aggregate purchase price in an amount equal to $10,000,000.00 (the "<u>Purchase Price</u>"). Buyer has delivered the Deposit contemporaneously with this Agreement. The Purchase Price shall be payable at the Closing in cash by wire transfer in immediately available funds to Seller in an amount equal to $10,000,000.00 less the Deposit (such net amount, the "<u>Closing Cash Consideration</u>"). Seller shall provide to Buyer its wire transfer instructions at least five (5) days prior to the Closing.

Section 4.2   <u>Prorations</u>. As of the Closing Date, utility charges, rents and other charges under the Assumed Leases, real and personal property Taxes and other similar obligations to third parties will be prorated between Seller, on the one hand, and Buyer, on the

other hand. Except as may be otherwise provided in any Assumed Lease, ad valorem taxes and assessments on the Real Property Purchased Assets attributable to the year 2010 have been prorated between Seller and Buyer as of the date of the Real Property Deeds, and Buyer assumes the payment of such taxes for the current and all subsequent years.  Ad valorem taxes and assessments which have been assessed against the Real Property Purchased Assets for the year 2009 and prior years will be paid in full by Seller.  The conveyance of the Real Property Purchased Assets is also made subject to, and Buyer assumes the payment of, all subsequent assessments on the Real Property Purchased Assets (and any interest and penalties thereon) for the current and prior years for any reason, including assessments due to the change in ownership or due to any change in use by Buyer.  Subject to the specific provisions for ad valorem taxes and assessments on the Real Property Purchased Assets set forth in this Section 4.2 and the Real Property Deeds, in the event any adjustments made pursuant to this Section are determined to be erroneous (for any reason), then either party hereto who is entitled to such additional monies shall invoice the other party for such additional amounts as may be owing, and such amounts shall be paid within ten (10) days from receipt of any such invoice; provided that no such amounts may be so billed following the expiration of one (1) year after the Closing Date. Final readings and final billings for utilities will be made if possible as of the Closing Date, in which event no proration shall be made at the Closing with respect to utility bills.

Section 4.3    Allocation of the Purchase Price.

(a)    The sum of $9,000,000.00 will be allocated to the Real Property Purchased Assets.  The balance of the Purchase Price will be allocated among the remaining Purchased Assets as of the Closing Date in accordance with the relative fair market value of the remaining Purchased Assets at that time, to the extent relevant, and in a manner consistent with Section 1060 of the Code.  Buyer and Seller will use their respective commercially reasonable efforts to agree upon a written statement setting forth such allocation on or before the Closing Date (the "Allocation").  If Buyer and Seller are unable to agree upon the Allocation by the Closing Date, the disputed items will be resolved promptly following the Closing by an independent accounting firm jointly selected by Buyer and Seller.

(b)    The transactions contemplated hereby will be reported for Tax purposes in a manner consistent with the Allocation. Neither Buyer nor Seller will take any position inconsistent therewith. Buyer, on the one hand, and Seller, on the other hand, will cooperate with the other in preparing IRS Form 8594 and will furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.

## ARTICLE V
## THE CLOSING

Section 5.1    Time and Place of Closing. The consummation of the sale and transfer of the Purchased Assets provided for in this Agreement (the "Closing") will occur on the Closing Date, at the offices of the Title Company, or such other place as Buyer and Seller may mutually agree, subject to satisfaction or waiver of all the conditions to Closing set forth in Article IX.

143269_1.DOC

Section 5.2    Deliveries by Seller. At the Closing, Seller will deliver to Buyer the following:

(a)    certified copies of the Bidding Procedures Order and the Sale Order;

(b)    each Ancillary Agreement required to be duly executed by Seller, and with respect to the Real Property Deeds, executed by the ABC&P Parties or by Seller as authorized by the Bankruptcy Court pursuant to the Rule 70 Order;

(c)    a foreign person affidavit sworn to by Seller as required by Section 1445 of the Code;

(d)    releases and other documentation reasonably requested by Buyer in form and substance reasonably satisfactory to Buyer providing for the termination and release of all Liens on the Purchased Assets; *provided, however*, should any party which holds a Lien(s) in any of the Purchased Assets refuse to execute and deliver such releases and other documentation providing for the termination and release of such Lien(s), Seller shall obtain Bankruptcy Court authority to execute such documents on behalf of any refusing party pursuant to Fed. R. Civ. P. 70 and Fed. R. Bkr. P. 7070, as a separate order of the Bankruptcy Court or to be included in the Sale Order;

(e)    such other documents and instruments as may be reasonably required to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and to comply with the terms hereof and thereof; including but not limited to all documents required to be executed by Seller as authorized by the Bankruptcy Court pursuant to the Rule 70 Order with respect to the Titled Purchased Assets;

(f)    all keys in Seller's possession or control to all locks on the Improvements;

(g)    all other documents in the possession of Seller and/or Debtor and material to Buyer's ownership or operation of the Real Property Purchased Assets, including all Permits and Licenses – to the extent such Permits and Licenses are assignable – approvals, plans, specifications, guaranties and warranties relating to the Real Property Purchased Assets and in Seller's possession, save and except any and all documents deemed necessary by Seller in its discretion to fully and completely administer the Bankruptcy Case; *provided* that promptly following the full administration of such Bankruptcy Case and at Buyer's request Seller will make any such documents available to Buyer;

(h)    the Title Commitment; and

(i)    possession of the Real Property Purchased Assets.

Section 5.3    Deliveries by Buyer. At the Closing, Buyer will deliver to Seller the following:

(a)    the Closing Cash Consideration by wire transfer of immediately available funds;

143269_1.DOC

13

     (b)    each Ancillary Agreement required to be duly executed by Buyer; and

     (c)    such other documents and instruments as may be reasonably required to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and to comply with the terms hereof and thereof.

     Section 5.4    Intentionally Omitted.

# ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

     Section 6.1    Authorization, No Conflicts, Etc. Seller is the Chapter 11 Trustee of Debtor. Seller, subject only to entry of the Sale Order by the Bankruptcy Court, has the requisite power and authority to execute and deliver this Agreement and to execute and deliver the Ancillary Agreements and all other agreements, instruments and documents contemplated hereby to be executed and delivered by it. Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by Seller and (assuming this Agreement constitutes a valid and binding obligation of Buyer and upon the entry and effectiveness of the Bidding Procedures Order and the Sale Order) constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, neither the execution and delivery of this Agreement, the Ancillary Agreements, or any other agreement, instrument or document contemplated hereby to be executed and delivered by Seller nor the performance of the obligations of Seller hereunder or thereunder will result in the (i) violation of any applicable Law, (ii) require any filing with or permit, consent or approval of, or the giving of any notice to, any Person (including filings, consents or approvals required under any Permits and Licenses to which Seller is a party), (iii) result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Seller or to a loss of any benefit to which Seller is entitled under, any Purchased Contract or Assumed Lease binding upon Seller or any of the Permits and Licenses, franchises or other similar authorizations held by Seller, or (iv) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of Seller.

     Section 6.2    Consents and Approvals. No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity is required to be made or obtained by Seller in connection with the execution and delivery of this Agreement, the Ancillary Agreements, or any other agreement, instrument or document contemplated hereby to be executed and delivered by Seller or the performance of the obligations of Seller hereunder or thereunder, except for (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court in connection with the entry and effectiveness of the Bidding Procedures Order and the Sale Order, (ii) the filing of such assignments or other conveyance documents as may be required to transfer Seller's interest in any Purchased Assets and the ABC&P Parties' interest in the Real Property Purchased Assets, and (iii) the filing of such documents as may be necessary to reflect the release of any Liens as a matter of public record.

143269_1.DOC

Section 6.3    Title to Assets and Properties; Liens. Subject to the claims of the ABC&P Parties as to the Purchased Assets identified on Schedule 6.3 attached hereto (collectively, the "Titled Purchased Assets"), which claims have been settled by a Compromise Settlement Agreement approved by the Bankruptcy Court [Docket No. 364] which agreement provides, *inter alia*, for the waiver and release of all such claims by the ABC&P Parties, Seller has good, valid, legal and indefeasible title to the Purchased Assets, including, without limitation, the Titled Purchased Assets. Subject to entry and effectiveness of the Sale Order, at the Closing, Seller will transfer to Buyer good, valid, legal and indefeasible title to all of the Purchased Assets, including, without limitation, the Titled Purchased Assets free and clear of all Liens and Claims and other encumbrances or clouds on title, other than Permitted Liens. The Trustee, on behalf of Goodcrane Corporation, as the lessee under the leases on Schedule B, items 10(p) and 10(u) of the Title Commitment (the "Terminated Leases"), and Buyer and Seller agree that the Terminated Leases shall be automatically terminated upon Closing, and all rights, claims and causes of action under the Terminated Leases shall be deemed waived upon Closing. To the best of Seller's knowledge, information and belief, after diligent inquiry, the Titled Purchased Assets constitute property of Debtor's Estate pursuant to Section 541 of the Bankruptcy Code. At the Closing, in accordance with the terms of the Sale Order and the Stipulation and Order, Seller shall (pursuant to the Rule 70 Order or otherwise), and shall cause the ABC&P Parties to, (i) execute the Real Property Deeds and any other documents required to transfer to Buyer good, valid, legal and indefeasible title to the Titled Purchased Assets, free and clear of all Liens and Claims, other than Permitted Liens pursuant to Section 363(f) of the Bankruptcy Code, and (ii) to comply with all requests and instructions from the Title Company in connection with the transfer of the Real Property Purchased Assets and the issuance of the title policy in connection therewith.

Section 6.4    Material Facts. Seller has disclosed to Buyer all material facts known to it relating to Debtor, the business of Debtor, and the Purchased Assets, including but not limited to those contained within the docket entries in the Bankruptcy Case.

Section 6.5    FIRPTA Certification. Seller is not a "foreign person" as defined in Section 1445 of the Code.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

Section 7.1    Due Organization, Etc. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. Buyer has the requisite power and authority to execute and deliver this Agreement and to execute and deliver the Ancillary Agreements and all other agreements, instruments and documents contemplated hereby to be executed and delivered by it.

Section 7.2    Authorization, Etc. Buyer has the requisite power and authority to execute and deliver this Agreement and to execute and deliver the Ancillary Agreements and all

143269_1.DOC

other agreements, instruments and documents contemplated hereby to be executed and delivered by it. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order, this Agreement has been duly and validly executed and delivered by Buyer and (assuming this Agreement constitutes a valid and binding obligation of Seller and upon the entry and effectiveness of the Bidding Procedures Order and the Sale Order) constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

Section 7.3    Consents and Approvals. No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity is required to be made or obtained by Buyer in connection with the execution and delivery of this Agreement, the Ancillary Agreements, or any other agreement, instrument or document contemplated hereby to be executed and delivered by Buyer or the performance of the obligations of Buyer hereunder or thereunder, except for (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court in connection with the entry and effectiveness of the Bidding Procedures Order and the Sale Order, (ii) consents, approvals or authorizations necessary to transfer the Permits and Licenses, and (iii) consents, approvals or authorizations, declarations or filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
## COVENANTS

Section 8.1    Conduct of Business.

(a)    During the period from the date of this Agreement through the earlier of the Closing or the termination of this Agreement in accordance with Article X (the "Pre-Closing Period"), except as otherwise provided in this Agreement or the Bidding Procedures Order (after entry thereof), Seller will use its commercially reasonable efforts to conduct Debtor's operations in the ordinary and usual course of business consistent with past practice and the availability of funds for such operations.

(b)    Without limiting the generality or effect of the foregoing, during the Pre-Closing Period, Seller will use its commercially reasonable efforts to (i) preserve intact Debtor's business organization, (ii) keep available the services of leased employees, (iii) continue in full force and effect without material modification all existing material policies or binders of insurance currently maintained in respect the Estate Transferring Parties, (iv) pay Debtor's post-petition debts (other than debts owed to Debtor's Chief Restructuring Officer and professionals employed by Debtor, Seller, or the Official Committee of Unsecured Creditors) and trade and other accounts payable punctually when and as the same will become due and payable and perform and observe, in all material respects, its duties and obligations under all Assumed Leases, Purchased Contracts and Post-Agreement Contracts, (v) maintain the Purchased Assets in the same condition as they are as of the date hereof, subject only to ordinary wear and tear and other changes in the ordinary and usual course of business consistent with past practice, and

143269_1.DOC

16

(vi) maintain its relationships and goodwill with customers, mechanics, materialmen, suppliers, landlords, employees, agents and others having business relationships with Debtor.

(c)   Except as expressly permitted herein, Seller will not, without the prior written consent of Buyer (i) renew, amend or voluntarily terminate any Assumed Lease or Purchased Contract, (ii) encumber, sublease or otherwise grant any Liens or other rights with respect to the Purchased Assets, except to the extent any Lien is approved by the Bankruptcy Court in any modification to the Memorandum of Understanding between Seller and CVI Global Lux Oil and Gas S.Á.R.L. regarding an 850 ton crane, or (iii) enter into any Contracts affecting the Purchased Assets or that will be binding on Buyer.

Section 8.2   Access. During the Pre-Closing Period, Seller will (i) allow all designated officers, attorneys, accountants and other representatives of Buyer reasonable access at reasonable times to the leased employees, accountants and other representatives of Seller and/or Debtor and the books and records of Seller and/or Debtor, (ii) furnish to Buyer and its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information as such Persons may reasonably request, and (iii) allow Buyer, personally or through its authorized agent or representative, to enter upon the Real Property Purchased Assets during normal business hours and shall have the right to make such investigations, including appraisals, engineering studies, soil tests, environmental studies and underwriting analysis, as Buyer deems necessary or advisable, subject to the following limitations: (a) Buyer shall give Seller reasonable advance written notice before conducting any inspections, and a representative of Seller shall have the right to be present when Buyer or its representatives conducts its or their investigations on the Real Property Purchased Assets; (b) Buyer shall indemnify, hold harmless and defend Seller against, and hold Seller harmless from, all loss, costs (including reasonable attorneys' fees), and expenses that may be incurred by Seller as a result of physical damage to the Real Property Purchased Assets, or personal injury or death caused by any such inspections and/or tests, and (c) Buyer shall be responsible for the repair of any damage caused to the Real Property Purchased Assets by any of Buyer's employees, agents, representatives or servants in connection with such inspections to a condition substantially similar to that existing prior to such damage; *provided* that Buyer shall not be responsible for any pre-existing liabilities for matters merely discovered by Buyer (i.e., latent environmental contamination); *provided, however,* that subject in all respects to the provisions of Section 10.1(b)(vi), no such access, inspection or investigation by Buyer shall provide Buyer with any right to terminate this Agreement.

Section 8.3   Bankruptcy Filings and Auction Procedures.

(a)   Seller will perform and comply with all of the obligations of Seller under (i) the Bidding Procedures Order, and (ii) the Sale Order (after entry thereof).

(b)   Other than as expressly authorized pursuant to the Bidding Procedures Order, Seller shall not, and shall not cause, authorize or permit any of its Affiliates or Representatives to, directly or indirectly, (i) solicit, initiate, negotiate, or encourage the submission of, or accept or agree to, any offer for the purchase of the Purchased Assets by any Person other than Buyer, other than consummation of the sale from Seller to Offshore previously approved by the Bankruptcy Court [Docket No. 363], (ii) furnish any non-public information to

143269_1.DOC

17

any Person other than Buyer, its Affiliates or Representatives relating to Debtor or the Purchased Assets, except in connection with (A) unsolicited requests for information from Persons who have signed a confidentiality agreement with Seller in form and substance acceptable to Buyer, (B) providing notices of the Bidding Procedures Motion or the Sale Motion and responding to inquiries and objections with respect thereto, and (C) providing information to Offshore as required or permitted under the terms of the Asset Purchase Agreement between Seller and Offshore previously approved by the Bankruptcy Court [Docket No. 363], or (iii) enter into any negotiations or substantive discussions or agreements or arrangements in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Bankruptcy Court that provides for a sale to any specifically identified Person) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to Buyer (an "Alternative Transaction"). The provisions of the immediately preceding sentence are referred to herein as the "No-Shop Provisions." For the avoidance of doubt, any statements made by Seller in the Bidding Procedures Motion, the notice thereof or in the hearing in connection therewith shall not be deemed to be a solicitation for purposes of this Agreement or a violation of the No-Shop Provisions. Nothing in this Section 8.3(b) shall prohibit or restrict Seller and its Affiliates and Representatives from providing information about the Bidding Procedures Motion or the Bidding Procedures Order to any Person (or information about Debtor to Persons who have signed a confidentiality agreement in form and substance acceptable to Buyer) which was not solicited after the date of this Agreement in violation of this Section 8.3(b).

(c)     Until the Auction, Seller and its Affiliates and Representatives shall be permitted to market and solicit inquiries, proposals, offers or bids from, any Person other than Buyer regarding an Alternative Transaction.   None of Seller nor any of its Affiliates or Representatives shall have any liability to Buyer or any of its Affiliates or Representatives, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of an Alternative Transaction or consummating the sale from Seller to Offshore previously approved by the Bankruptcy Court [Docket No. 363]

(d)     If Buyer is selected as Winning Bidder, Seller will recommend to the Bankruptcy Court that the Sale Order be entered, but Buyer recognizes and acknowledges that the Bankruptcy Court, it its discretion, may not enter the Sale Order.  If Buyer is selected as Winning Bidder, from the date of the Auction until the earlier of (i) the Closing Date or (ii) the valid termination of this Agreement pursuant to Section 10.1, Seller shall not, directly or indirectly, pursue or facilitate any Alternative Transaction or, solicit, accept, facilitate, review, cooperate with, discuss, or provide information in connection with, any offer, inquiry, proposal, bid or indication of interest from any Person, or respond to any inquiries from or engage in any negotiations with any Person, or share any information regarding Debtor, with respect to or in possible contemplation of any Alternative Transaction, and Seller shall not assist, cooperate with or help to facilitate any other Person in taking or effecting any such actions.

143269_1.DOC

Section 8.4    Commercially Reasonable Efforts. Buyer, on the one hand, and Seller, on the other hand, will use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with each other in doing, all things necessary, proper or advisable to consummate, in the most expeditious manner practicable, the transactions contemplated hereby, including the satisfaction of the conditions set forth in Article IX.

Section 8.5    Filings with Governmental Entities; Permits and Licenses.

(a)    Without limiting the generality or the effect of Section 8.4, Buyer, on the one hand, and Seller, on the other hand, will (i) cooperate with each other in connection with, and use their respective commercially reasonable efforts to provide information required for, any application or other filing to be made with any Governmental Entity in connection with the transactions contemplated by this Agreement, and (ii) cooperate with each other in connection with, and use their respective commercially reasonable efforts to resolve, objections, if any, that are asserted by any Governmental Entity with respect to the transactions contemplated hereby.

(b)    Without limiting the generality or effect of Section 8.4, Buyer, on the one hand, and Seller, on the other hand, will use their commercially reasonable efforts to (i) effect the transfer of the Permits and Licenses to Buyer on the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) enable Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations and authorizations as may be necessary for the lawful operation of the Purchased Assets by Buyer from and after the Closing Date.

Section 8.6    Tax Matters. Buyer, on the one hand, and Seller, on the other hand, will (i) provide each other with any assistance that may reasonably be requested by the other in connection with the preparation of any Tax Return, audit or other examination by any taxing authority or judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other with any records or other information that may be relevant to that Tax Return, audit, examination or proceeding, and (iii) provide each other with any final determination of any such audit, examination or proceeding that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, Buyer, on the one hand, and Seller, on the other hand, will retain until the applicable statutes of limitations (including any extensions) have expired copies of all records or information that may be relevant to Tax Returns filed by the other for all Tax periods or portions thereof ending before or including the Closing Date. Such records and information may nevertheless be destroyed by either party if such party sends to the other party written notice of its intent to destroy such records and information, specifying with particularity the contents of the records and information to be destroyed. Such records and information may then be destroyed after the 30th day after such notice is given unless the party receiving the notice objects to the destruction, in which case the party that provided the notice will deliver, at the objecting party's expense, such records to the objecting party.

Section 8.7    Amounts Received and Paid to Seller After Closing. Following the Closing, Seller will promptly pay, or cause to be paid, by wire transfer of immediately available funds to Buyer any amounts that are received by Seller or any of its Affiliates, in respect of any

143269_1.DOC

19

of the Purchased Assets, and provide Buyer with information as to the nature and source of any such amount.

Section 8.8    Further Assurances.

(a)    Seller will (pursuant to the Rule 70 Order or otherwise), and with respect to the Real Property Purchased Assets, will cause the ABC&P Parties to execute and deliver such agreements, instruments and documents and take such other action as may be reasonably requested by Buyer in order to carry out this Agreement and consummate, make effective and enforce the transactions contemplated hereby.

(b)    Without limiting the generality or effect of Section 8.8(a), Seller will (pursuant to the Rule 70 Order or otherwise), and with respect to the Titled Purchased Assets, will cause the ABC&P Parties, to execute, deliver and cause to be filed such assignments and other conveyance documents as may be required to transfer Seller's interest in the Titled Purchased Assets and any other Purchased Assets, the title to which is governed by filing in the public records (including all trucks, cars, other vehicles and rolling stock).

Section 8.9    Intentionally Omitted.

Section 8.10    Books and Records.

(a)    Buyer and Seller will preserve for a period of three years after the Closing Date (or such longer period as may be required by any Governmental Entity or ongoing claim) all books and records related to the business of Seller and/or Debtor prior to the Closing Date. After the Closing Date, where there is a legitimate purpose, the party hereto that has received a request for access (the "Requested Party") will provide the party hereto requesting access (the "Requesting Party") with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to the books of account and records of the Requested Party, but, in each case, only to the extent relating to the acts, conduct, property, liabilities, financial condition and conduct of the business of Seller and/or Debtor prior to the Closing Date, and the Requesting Party and its authorized representatives will have the right to make copies of such books and records at its sole cost and expense; *provided, however*, that the foregoing right of access will not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of the Requested Party. Such books and records may, subject to the notice provisions hereof, nevertheless be destroyed by either party if such party sends to the other party written notice of its intent to destroy such books and records, specifying with particularity the contents of the books and records to be destroyed. Such books and records may then be destroyed after the 30th day after such notice is given unless the party receiving the notice objects to the destruction, in which case the party that provided the notice will deliver, at the objecting party's expense, such records to the objecting party.

(b)    Seller agrees that it will not use, publish, disseminate, distribute or otherwise disclose all or any portion of the books and records obtained from Buyer without the prior written approval of Buyer. In the event that Seller receives either a request to disclose all or any portion of such books or records under the terms of a subpoena or order issued by a court or other governmental or regulatory authority or advice of legal counsel that disclosure is required

under applicable law, Seller agrees that, prior to disclosing any such portion of such books or records, it will (i) immediately notify Buyer of the existence and terms of, and the circumstances attendant to, such request or advice, (ii) consult with Buyer as to the advisability of taking, at Buyer's sole expense, legally available steps to resist or narrow any such request or to otherwise eliminate the need for such disclosure, and (iii) if disclosure is required, cooperate with Buyer to obtain, at Buyers' sole expense, a protective order or other reliable assurance that confidential treatment will be accorded to such portion of such books and records as is required to be disclosed.

Section 8.11   Notice of Sale.  Notice of this Agreement and notice of the Sale Motion and Sale Order and the hearings therefor shall be duly and properly given by (i) actual notice to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual Liens on the Purchased Assets, the lessors on material Leases of Debtor, the non-Seller parties to the Purchased Contracts, and applicable taxing and Governmental Entities, and (ii) publication in the Houston Chronicle.  Seller and Buyer shall split equally the cost of the notices required to be given by this Section 8.11.

**ARTICLE IX**
**CONDITIONS**

Section 9.1   Conditions to Seller's Obligations.  Seller's obligations to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or written waiver by Seller) at or prior to the Closing Date of each of the following conditions:

(a)   Representations and Warranties; Covenants.

(i)   All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that speak as of an earlier date, which shall be true and correct as of such date), except that those representations and warranties made by Buyer that contain materiality or other similar qualifiers shall be true and correct in all respects.

(ii)   Buyer shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date in all material respects.

(iii)   Seller shall have received a certificate, signed by a duly authorized officer of Buyer and dated as of the Closing Date, to the effect that the conditions set forth in Sections 9.1(a)(i) and 9.1(a)(ii) have been satisfied.

(b)   No Injunction. No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

(c)   Sale Order. The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a Final Order.

143269_1.DOC

(d)     Buyer's Deliveries. Buyer shall have duly executed and delivered to Seller each agreement, instrument and document required to be delivered under Section 5.3.

Section 9.2    Conditions to Buyer's Obligations.   Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or written waiver by Buyer) at or prior to the Closing Date of each of the following conditions:

(a)     Representations and Warranties; Covenants.

(i)     All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that speak as of an earlier date, which shall be true and correct as of such date), except that those representations and warranties made by Seller that contain materiality or other similar qualifiers shall be true and correct in all respects.

(ii)     Seller shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date in all material respects.

(iii)     Buyer shall have received a certificate, signed by Seller and dated as of the Closing Date, to the effect that the conditions set forth in Sections 9.2(a)(i) and 9.2(a)(ii) have been satisfied.

(b)     No Injunction. No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

(c)     Sale Order. The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a Final Order.

(d)     Seller's Deliveries. Seller (pursuant to the Rule 70 Order or otherwise) and the ABC&P Parties, as applicable, shall have duly executed and delivered to Buyer each agreement, instrument and document required to be delivered under Section 5.2 and Section 8.8.

(e)     Material Adverse Effect. There shall have been no change, event or development since the date of this Agreement that has had or would reasonably be expected to have a material adverse effect on the condition or value of the Purchased Assets or the operations relative to the Purchased Assets.

(f)     Permits and Licenses. Buyer shall have obtained all licenses, permits, approvals, consents, certificates, registrations and authorizations as may be necessary for the lawful operation of the Purchased Assets by Buyer from and after the Closing Date.

## ARTICLE X
## TERMINATION

Section 10.1  <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     by the mutual consent of Buyer and Seller;

(b)     by Buyer (provided that Buyer is not then in material breach of any provision of this Agreement):

(i)     if the Bankruptcy Court has not entered the Sale Order by September 15, 2010, or the Sale Order is entered by such date but (A) is stayed by order of the Bankruptcy Court or of some other federal district or appeals court (and such stay is not terminated by September 15, 2010) or (B) ceases to be effective and is not reinstated on or before September 15, 2010;

(ii)     upon the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case, or any similar commencement of liquidation proceedings relating to Seller, other than as contemplated herein;

(iii)     if the Closing does not occur on or before October 1, 2010, unless the failure to consummate the Closing is due to the failure of Buyer to perform any of its obligations under this Agreement to the extent required to be performed by Buyer on or prior to the Closing Date;

(iv)     if Seller executes an Alternative Agreement or takes affirmative steps to effect an Alternative Transaction; *provided, however,* if Buyer is determined by the Bankruptcy Court to have submitted the Back-Up Bid, Buyer may not terminate this Agreement until such time as Seller closes an Alternative Transaction with the third party determined by the Bankruptcy Court to have submitted the Highest and Best Bid;

(v)     upon the entry of an order of the Bankruptcy Court for the replacement of Seller as chapter 11 trustee or an examiner with managerial powers, other than at the request of Buyer or any of its Affiliates, under Bankruptcy Code Section 1104 and such trustee or examiner takes any action to interfere with or impair the transactions contemplated by this Agreement;

(vi)     if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of Buyer set forth in <u>Section 9.2</u> and cannot be cured within thirty Business Days after the giving of notice to Seller;

(vii)     if the Bankruptcy Court fails to enter the Sale Order (in form reasonably satisfactory to both parties hereto) by September 15, 2010;

(viii)   if Buyer is not determined to have the Highest and Best Bid at the Auction pursuant to the Bidding Procedures Order; or

(ix)   if Seller has not used its commercially reasonable efforts to cause the Sale Order become a Final Order by September 30, 2010; *provided, however,* that taking any action required or permitted by Section 8.3 shall not be deemed to be a failure by Seller to exert its commercially reasonable efforts.

(c)   by Seller (provided that Seller is not then in material breach of any provision of this Agreement):

(i)   if all of the conditions in Section 9.1 have been satisfied, and Buyer fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii)   if the Bankruptcy Court has not entered the Sale Order by September 15, 2010 and such order does not become a Final Order by September 30, 2010, or the Sale Order is entered by September 15, 2010 but (A) is stayed by order of the Bankruptcy Court or of some other federal district or appeals court (and such stay is not terminated by September 30, 2010) or (B) ceases to be effective and is not reinstated on or before September 30, 2010;

(iii)   if the Closing does not occur on or before October 1, 2010, unless the failure to consummate the Closing is due to the failure of Seller to perform any of its obligations under this Agreement to the extent required to be performed by Seller on or prior to the Closing Date;

(iv)   if Seller executes an Alternative Agreement or consummates the sale from Seller to Offshore previously approved by the Bankruptcy Court [Docket No. 363] at or before the Auction; or

(v)   if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of Seller set forth in Section 9.1 and cannot be cured within thirty Business Days after the giving of notice to Buyer.

Section 10.2   Procedure and Effect of Termination. In the event of termination of the transactions contemplated hereby pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party to this Agreement, and this Agreement shall terminate (subject to the provisions of this Section 10.2 and Section 10.3) and the transactions contemplated hereby shall be abandoned, without further action by either of the parties hereto. If this Agreement is terminated as provided herein:

(a)   upon request therefore, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

143269_1.DOC

24

(b)     no party hereto shall have any liability or further obligation under this Agreement, except that the provisions of <u>Sections 8.4</u>, <u>8.10</u>, and <u>10.2</u> and <u>Article XI</u> shall survive any termination and remain in full force and effect.

Section 10.3    [Intentionally omitted].


## ARTICLE XI
## MISCELLANEOUS

Section 11.1    <u>Successors and Assigns</u>. The provisions of this Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns. Buyer may not assign, transfer, convey or delegate any of its obligations under this Agreement without the prior written consent of Seller, *provided, however,* Buyer will be entitled to assign any or all of its rights hereunder to such other parties as it shall determine in its sole discretion, which assignment will not relieve Buyer of its obligations hereunder. Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the parties to this Agreement or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 11.2    <u>Notices</u>. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally against written receipt, by electronic or facsimile transmission with confirmation, mailed (postage prepaid by certified or registered mail, return receipt requested) or by overnight courier to the parties at the following addresses (or at such other address, electronic mail or facsimile number for a party as will be specified by such party by like notice):

If to Seller, addressed to:

Janet Northrup, Chapter 11 Trustee
Goodcrane Corporation
c/o Hughes Watters Askanase, LLP
Three Allen Center
333 Clay, 29th Floor
Houston, Texas 77002
Facsimile: (713) 759-6834
Email: jnorthrup@hwa.com

With copies (which will not
constitute notice hereunder) to:

Hughes Watters Askanase, LLP
Three Allen Center
333 Clay, 29th Floor
Houston, Texas 77002
Attention: Rhonda Chandler
Facsimile: (713) 759-6834
Email: rrc@hwa.com

If to Buyer, addressed to:

EZRAM Enterprise LLC
Attention:  Dale Alberda
1772 West Sam Houston Parkway North
Houston, Texas 77043
Facsimile:  (713) 464-3611
Email: dale.alberta@emasoffshore.com

With copies (which will not
constitute notice hereunder) to:

Locke Lord Bissell & Liddell, LLP
600 Travis St., Suite 3400
Houston, Texas  77002
Attention:  Philip K. Lau
Facsimile: (713) 229-2617
Email: plau@lockelord.com

All such notices, requests and other communications given pursuant to this Section 11.2 will be deemed to have been given (i) if delivered personally on the date of delivery or on the date delivery was refused by the addressee, (ii) if delivered by electronic or facsimile transmission, when transmitted to the applicable electronic mail or facsimile number so specified in (or pursuant to) this Section 11.2 and an appropriate confirmation is received, (iii) if delivered by mail in the manner described above to the address as provided in this Section 11.2, be deemed given three Business Days after mailing, or (iv) if delivered by overnight courier, on the date of delivery as established by the return receipt or courier service confirmation (or the date on which the courier service confirms that acceptance of delivery was refused by the addressee).

Section 11.3    Expenses; Transfer Taxes. Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement will be paid by the party incurring the cost or expense. All transfer, documentary, sales, use, stamp, registration and other similar transaction type Taxes, and all duties, conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement will be paid by the party responsible therefor under applicable Law.

143269_1.DOC

26

Section 11.4   Entire Agreement. This Agreement and the exhibits and schedules hereto, and any agreement, instrument or document delivered by the parties in connection herewith or therewith, constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings (both written and oral) between the parties with respect thereto.

Section 11.5   Binding Effect; No Third-Party Beneficiary. This Agreement shall bind and inure to the benefit of parties and their respective successors and permitted assigns. This Agreement shall be binding upon and inure solely to the benefit of the Seller, Buyer and their respective successors and permitted assigns, and, except as provided in this Section 11.5, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 11.6   "AS IS/WHERE IS" SALE. EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE VI, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND (INCLUDING ANY REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY OR FITNESS OF THE PURCHASED ASSETS FOR THEIR INTENDED PURPOSES OR ANY PARTICULAR PURPOSE), EXPRESSED OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES. BUYER ACKNOWLEDGES THAT THE PURCHASED ASSETS ARE BEING SOLD, TRANSFERRED, CONVEYED, ASSIGNED AND DELIVERED TO, AND ACQUIRED AND PURCHASED BY, BUYER ON AN "AS IS/WHERE IS" BASIS.

Section 11.7   Waiver. Except as provided in this Agreement, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. The waiver by any party of a breach of any provision hereunder will not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder. At any time prior to the Closing, any party hereto may as to itself (i) extend the time for the performance of any of the obligations or other acts of any of the other parties, (ii) waive any inaccuracies in the representations and warranties of any of the other parties contained herein or in any agreement, instrument or document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions contained herein. Any such extension or waiver will be valid only if set forth in an instrument in writing signed by the party to be bound thereby.

Section 11.8   Waiver of Right to Trial by Jury. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD

143269_1.DOC

NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.8.

Section 11.9   Waiver of Consequential Damages.   NOTWITHSTANDING ANYTHING CONTAINED TO THE CONTRARY IN THIS AGREEMENT, THE SELLER AND BUYER AGREE THAT THE RECOVERY BY EITHER PARTY HERETO OF ANY DAMAGES SUFFERED OR INCURRED BY IT AS A RESULT OF ANY BREACH BY THE OTHER PARTY OF ANY OF ITS REPRESENTATIONS, WARRANTIES OR OBLIGATIONS UNDER THIS AGREEMENT SHALL BE LIMITED TO THE ACTUAL DAMAGES SUFFERED OR INCURRED BY THE NON-BREACHING PARTY AS A RESULT OF THE BREACH BY THE BREACHING PARTY OF ITS REPRESENTATIONS, WARRANTIES, OR OBLIGATIONS HEREUNDER AND IN NO EVENT SHALL THE BREACHING PARTY BE LIABLE TO THE NON-BREACHING PARTY FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING ANY DAMAGES ON ACCOUNT OF LOST PROFITS OR OPPORTUNITIES OR LOST OR DELAYED PRODUCTION) SUFFERED OR INCURRED BY THE NON-BREACHING PARTY AS A RESULT OF THE BREACH BY THE BREACHING PARTY OF ANY OF ITS REPRESENTATIONS, WARRANTIES, OR OBLIGATIONS HEREUNDER.

Section 11.10   Amendment.   Subject   to   applicable   Law,   including   the requirements of the Bankruptcy Code and orders of the Bankruptcy Court, this Agreement may only be amended by an instrument in writing signed by Seller and Buyer.

Section 11.11   Counterparts; Facsimile Signatures.   This Agreement may be executed by the parties hereto in any number of counterparts, each of which when so executed and delivered will be an original, with the same effect as if the signature thereto were upon the same instrument. Each counterpart may consist of a number of copies hereof each signed by one, but together signed by all of the parties. An electronic copy of a signature page will be deemed to be an original signature page.

Section 11.12   Choice of Law.   This Agreement will be governed by and construed in accordance with the laws of the State of Texas, without regard to its conflict of laws principles.

Section 11.13   Jurisdiction; Consent to Service of Process.

(a)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court from such court, in any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each party hereto hereby

143269_1.DOC

28

irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in the Bankruptcy Court.

(b)     It is a condition precedent to the right of each party hereto to bring any such suit, action or proceeding that such suit, action or proceeding, in the first instance, be brought in the Bankruptcy Court, and if each such court refuses to accept jurisdiction with respect thereto, such suit, action or proceeding may be brought in any other court with jurisdiction.

(c)     No party hereto may move to (i) transfer any such suit, action or proceeding from the Bankruptcy Court to another jurisdiction, (ii) consolidate any such suit, action or proceeding brought in the Bankruptcy Court with a suit, action or proceeding in another jurisdiction, or (iii) dismiss any such suit, action or proceeding brought in the Bankruptcy Court for the purpose of bringing the same in another jurisdiction.

(d)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in the Bankruptcy Court, (ii) the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (iii) the right to object, with respect to such suit, action or proceeding, that such court does not have jurisdiction over such party. Each party hereto irrevocably consents to service of process in any manner permitted by Law.

Section 11.14  Damage or Destruction. In the event of any loss or damage to all or any portion of the Real Property Purchased Assets caused by fire or any other casualty between the date hereof and the Closing, Buyer shall have the right to terminate this Agreement by giving written notice to Seller within ten (10) days following the provision of written notice to Buyer of such casualty, in which event this Agreement shall be terminated, and neither party shall have any further obligations hereunder other than those which expressly survive. If Buyer does not elect to terminate this Agreement, the net proceeds of any insurance collected by Seller prior to the Closing and the amount of any deductible under the insurance policy(ies) maintained by Seller with respect to the Real Property Purchased Assets as of the date hereof will be paid to Buyer at the Closing, all unpaid claims and rights of Seller under such insurance that have not been collected by the time of the Closing shall be assigned to Buyer at the Closing, and the Purchase Price shall not be reduced or adjusted as a result thereof.

Section 11.15  Condemnation. In the event of any taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of all or any portion of the Real Property Purchased Assets between the date hereof and the Closing, Buyer shall have the right to either (i) terminate this Agreement, in which event neither Buyer nor Seller shall have any further rights or liabilities hereunder other than those which expressly survive, or (ii) proceed with the Closing in accordance with this Agreement, in which event, Seller shall be relieved of its duty to convey title to the portion so taken or condemned, and Buyer will be entitled to receive all proceeds of any such taking or condemnation, and the Purchase Price shall not be reduced or adjusted as a result thereof; provided Seller will make no adjustment or settlement of such condition without

143269_1.DOC

Buyer's consent and will take at closing all action necessary to assign its entire interest in any such award to Buyer.

*{Remainder of Page Intentionally Left Blank}*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly authorized, executed and delivered.

**BUYER:**

EZRAM Enterprise LLC
a Texas limited liability company

By:_____

Name: Dale Alberda
Its:     Manager

**SELLER:**

By:_____

JANET NORTHRUP, acting solely in her
capacity as the CHAPTER 11 TRUSTEE OF
GOODCRANE CORPORATION

143269_1.DOC

[Signature Page to Asset Purchase Agreement]

**Schedule 2.1(a)(i)**

**Assumed Leases**

None.

**Schedule 2.1(a)(ii)**

**Purchased Contracts**

Memorandum of Understanding dated as of July 23, 2009, between Seller and Stabbert Marine.

Memorandum of Understanding dated as of August 3, 2009, between Seller and CVI Global Lux Oil and Gas S.À.R.L., as amended.

Memorandum of Understanding dated as of October 12, 2009, between Seller and Otto Candies, LLC.

Memorandum of Understanding dated as of March 15, 2010, between Seller and Otto Candies, LLC.

Technical Services Agreement effective as of July 10, 2009, between Talent Force Services, LLC and Debtor.

Contents Insurance Policy (Policy # TBA) issued by Essex Insurance Company to Debtor, effective 6/30/2009 as renewed (the "Contents Policy").

Insurance Premium Finance Agreement dated as of July 17, 2009, between Capital Premium Financing Inc. and Seller with respect to the Contents Policy.

General Liability Insurance Policy (Policy # TBI) issued by Maxum Indemnity Co. to Debtor, effective 7/10/2009 as renewed (the "Liability Policy").

Insurance Premium Finance Agreement July 17, 2009, between Capital Premium Financing Inc. and Seller with respect to the Liability Policy.

**Schedule 2.1(a)(v)**

**Purchased/Excluded Vehicles**

<u>**Purchased Vehicles**</u>

1.  2008 Ford F-550, VIN 1FDAF56R68EA17840

2.  2008 Ford Ranger, VIN 1FTYR1OU18PA45985

3.  2008 Ford F-650, VIN 3FRNF65D48V656307

4.  1975 PHCR mobile crane, VIN 41212

5.  2007 Amerilite Camper, VIN 1NLIGTJ2271092373

<u>**Excluded Vehicles**</u>

1.  2007 Ford F-150 Crew Cab, VIN 1FTRW12W17KD48028

2.  2008 Ford E-250 van, VIN 1FTNS24L58DA11984

3.  2008 Ford F-350 SD Crew Cab, VIN 1FTWW33R68ED05425

4.  2007 Turtle Top Odyssey, 23 passenger "shuttle van", VIN 1FDXE45P56DB00489

5.  2008 Aston Martin coupe, VIN SCFAD01A18GA09684

143269_1.DOC

Schedule 2.1(a)(v)

**Schedule 6.3**

**Titled Purchased Assets**

the Real Property Purchased Assets

the following vehicles and rolling stock:

1. 2008 Ford F-550, VIN 1FDAF56R68EA17840

2. 2008 Ford Ranger, VIN 1FTYR1OU18PA45985

3. 2008 Ford F-650, VIN 3FRNF65D48V656307

4. 1975 PHCR mobile crane, VIN 41212

5. 2007 Amerilite Camper, VIN 1NLIGTJ2271092373

the following Intellectual Property, subject to Section 2.1(a)(xi):

| FILED IN NAME OF: | TITLE: | NUMBER: |
|---|---|---|
| Benjamin M. Almeda | *Pipe Gripper* | U.S.Prov. 61/126324 |
| GoodCrane Corporation | *Grapple / Tong Type Gripper* | PCT/US2009/042718 |
| Benjamin M. Almeda, Jr. & Patrick Almeda | *Motion Compensation System* | U.S.Prov. 60/993759 |
| Benjamin M. Almeda, Jr. & Patrick Almeda | *Motion Compensation System* | USSN 12/211024 |
| GoodCrane Corporation (all but U.S.) | *Motion Compensation System* | PCT/US2008/076450 |

143269_1.DOC

Schedule 6.3

# EXHIBIT A

## Stipulation and Order

See attached.



ENTERED
11/13/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 09-34031-H4-11 |
| | § | |
| GOODCRANE CORPORATION | § | Chapter 11 |
| | § | |
| Debtor | § | |

### STIPULATION AND ORDER REGARDING COMMERCIAL REAL PROPERTIES

Janet S. Northrup, Chapter 11 trustee (the "Trustee") of the bankruptcy estate of GoodCrane Corporation, ABC&P, LLC ("ABC&P"), and Benjamin B. Almeda, Jr., Corazon B. Almeda, Patrick Almeda, Maria Victoria Almeda, Benjamin B. Almeda, III, and Nancy J. Almeda (collectively the "Almedas"), by and through their respective counsel of record, stipulate as follows:

    1.    The following real properties in Harris County, Texas (each individually a "Property" and collectively the "Properties") are the subject of this Stipulation and Order:

    (a)    Tracts 1A, 1C-1, 1G & 11H, Houston Industrial District U/R Abstract 877 D White more particularly described in Exhibit "A", commonly known as 12221 Almeda Road, Houston, TX;

    (b)    The real property described on Exhibit "B", subject to the exceptions described on Exhibit "C", commonly known as 12218 Robin Blvd., Houston, TX; and

    (c)    The real property described on Exhibit "D", commonly known as 12268 Kirkgard Dr., Houston, TX.

    2.    The Trustee will market the Properties for sale, either separately or in combination, either with additional assets or alone, all such sales being subject to court approval. ABC&P and the Almedas will not hinder or interfere with the Trustee's marketing efforts.

1540314-1:GCRANE:0002

3.     Following court approval of the sale of any Property, ABC&P and the Almedas will allow the sale of any Property to close, and will timely execute and deliver a deed to such Property, in form acceptable to the Trustee, to convey the Property to the court-approved buyer, free and clear of any liens, claims, charges, encumbrances or interests of ABC&P and the Almedas.  ABC&P and the Almedas will not hinder or interfere with the closing of any court-approved sale of any Property, will execute and deliver such other documents as may be requested or required by the court-approved buyer or a title company to accomplish the sale, and will cooperate fully with the Trustee for conclusion of the sale.

4.     All net proceeds of sale attributable to any Property (after usual and customary closing costs, commissions if any, and expenses of sale) shall be distributed to the Trustee at closing, and shall be held by the Trustee in a segregated, interest-bearing account subject to further Order of this court.  All parties reserve all rights and claims to such segregated funds.

5.     The Trustee will request that the court pass, without prejudice to resetting, the hearing on her Motion for Partial Summary Judgment in Adv. Pro. No. 09-03318 scheduled for November 12, 2009.

Respectfully submitted,

HUGHES WATTERS & ASKANASE, LLP

By:     _Rhonda Chandler_
Rhonda R. Chandler
State Bar No. 04101600
333 Clay, Suite 2900
Houston, Texas 77002
Tel: 713-759-0818
Fax: 713-759-6834
rchandler@hwa.com
ATTORNEYS FOR THE TRUSTEE

1540314-1:GCRANE:0002                            2

# EXHIBIT B

**Bidding Procedures Motion and Bidding Procedures Order**

See attached.

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
08/16/2010

| | | |
|---|---|---|
| In re: | § | Case No. 09-34031-H4-11 |
| | § | |
| GOODCRANE CORPORATION, | § | (Chapter 11) |
| | § | |
| Debtor. | § | |
| | § | |

## ORDER APPROVING (I) SALE PROCEDURE AND
## FORM OF NOTICE; AND (II) BID PROTECTIONS
(Docket No. __449__ )

The Court has considered the Trustee's Emergency Motion to Approve (i) Sale Procedure and Form of Notice; and (ii) Certain Bid Protections. The Court finds that notice of the motion is sufficient under the circumstances; the requested relief is appropriate; and the bid protections are reasonable and consistent with the proper exercise of the Trustee's business judgment. Accordingly, it is

**ORDERED THAT:**

1.      The relief requested in the Trustee's Motion to Approve (i) Sale Procedure and Form of Notice; and (ii) Certain Bid Protections (the "Motion"), including approval of the Break-Up Fee (as defined in the Motion), is **granted**. The following procedures shall be used in the event Offshore Energy Holding, L.L.C. ("Offshore") continues to refuse to close the sale from the Trustee to Offshore previously approved by the Court [Docket No. 363] at or before the Auction.

2.      On the first business day following the entry date of this Order, the Trustee will serve by first class mail a notice containing the date of the final sale hearing to consider the sale of the Purchased Assets (as defined in the asset purchase agreement attached as **Exhibit 1**, the "Asset Purchase Agreement") to: (i) all potential purchasers previously identified or solicited by the Trustee during this bankruptcy case; (ii) all other potentially interested parties identified by the Trustee (with input from the Official Committee of Unsecured Creditors (the "Committee")) in her business judgment as a potential purchaser (collectively, with the parties identified in (i) above, the "Potential Purchasers"); (iii) the Office of the United States Trustee; (iv) counsel for Texas ReExcavation, LC or the other parties to which Texas ReExcavation, LC has assigned its rights under the Asset Purchase Agreement (as defined herein) (together with Texas ReExcavation, LC, such parties are referred to herein as "T-Rex"); (v) counsel for the Committee, (vi) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Purchased Assets; (vii) all applicable United States, state and local regulatory or taxing authorities, recording offices or any governmental entity which have a reasonably known interest in the relief requested in the Sale Motion; and (viii) all parties on the most current master service list filed in this case.

3.      Only Qualified Bidders may participate in the bidding process. To become a Qualified Bidder, a potential bidder must on or before 5:00 p.m. Central Time on August 31,

1748391-1:GCRANE:0002

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 45 of 77

Case 09-34031   Document 454   Filed in TXSB on 08/16/10   Page 2 of 20
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 2 of 77

2010 (i) execute and deliver to the Trustee a confidentiality agreement prepared by the Trustee and approved by T-Rex, (ii) deposit with the Trustee the sum of $200,000.00 (each, the "Alternative Buyer's Deposit") which deposit shall be nonrefundable unless such Qualified Bidder is not the highest and best offer as determined by the Court; (iii) submit to the Trustee an unqualified and binding cash bid of at least $6,300,000.00 along with an executed written agreement substantially in the form of the Asset Purchase Agreement attached as **Exhibit 1** as determined by the Trustee ("Qualified Bids"): *provided however,* Offshore Energy Holding, L.L.C. shall not be required to re-execute and deliver an Asset Purchase Agreement because it has previously executed and delivered an Asset Purchase Agreement approved by the Court [Docket No. 363] and *further provided* that the Trustee may consummate the sale to Offshore before the Auction; and (iv) provide financial and other information to the Trustee and the Committee that allows the Trustee and the Committee to make a reasonable determination as to such bidder's ability to consummate a sale as contemplated herein. T-Rex is and shall be deemed to be a Qualified Bidder and a party in interest for all purposes. If no other Qualified Bidders are identified, the Asset Purchase Agreement between the Trustee and T-Rex shall be deemed the Highest and Best Bid (as defined below). No letter of intent or other written proposal submitted to the Trustee prior to the filing of the Motion by any party other than T-Rex shall constitute or be considered a Qualified Bid for purposes of these sale procedures. The Trustee, in consultation with the Committee, shall be responsible for conducting the sale process.

4.       On or before 5:00 p.m. Central Time on September 1, 2010, the Trustee shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received. All information received by the Trustee shall be shared with counsel for the Committee and counsel for T-Rex. The Trustee shall serve a copy of the notice and the corresponding bids on all Qualified Bidders by (a) facsimile or electronic mail or (b) overnight delivery.

5.       If one or more timely Qualified Bids are received, an auction for the Purchased Assets will be conducted on September 2, 2010, commencing at 10:00 a.m. Central Time at the offices of Wayne Kitchens, Hughes, Watters & Askanase, L.L.P., 333 Clay, 29th Floor, Houston, Texas 77002. Only Qualified Bidders may participate in the auction. All Qualified Bidders, or their authorized representatives, must be physically present or present via teleconference at the auction. At the commencement of the auction, the Trustee shall announce the bidding order, which shall be based on: (i) the amount of the Qualified Bidder's bid (from low to high); and (ii) if Qualified Bids are identical, the time the Qualified Bids were delivered to the Trustee (the first such received identical bid going first in the auction); *provided, however,* that T-Rex shall bid last in any bidding round in which it participates. Minimum overbid increments at the auction shall be in the amount of not less than $100,000.00.

6.       At the conclusion of the auction, the Trustee will announce the highest and best Qualified Bid (the "Highest and Best Bid") and the next highest and best Qualified Bid (the "Back-Up Bid"). The Trustee will seek approval of the Highest and Best Bid at the final sale hearing. If for any reason, the Qualified Bidder submitting the Highest and Best Bid fails to timely consummate the purchase of the Purchased Assets, the Trustee may seek to consummate a sale based on the Back-Up Bid without further approval by the Court. The Back-Up Bid and the obligation of the party submitting such bid to consummate the purchase of the Purchased Assets shall remain open and in full force until the close of a sale of the Purchased Assets to the party making the Highest and Best Bid or the party making the Back-Up Bid.

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 46 of 77

Case 09-34031   Document 454   Filed in TXSB on 08/16/10   Page 3 of 20
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 3 of 77

7.      Within two business days after the conclusion of the auction described above, the Trustee shall return by check the full amount of the Alternative Buyer's Deposit submitted by each party that is not selected as submitting the Highest and Best Bid or the Back-Up Bid. If the sale of the Purchased Assets is consummated with the party submitting the Highest and Best Bid, the Alternative Buyer's Deposit of the party that is declared the Back-Up Bid shall be returned by check transfer within two business days after the closing of the sale to the party submitting the Highest and Best Bid.

8.      If (a) the Trustee enters into any agreements or arrangements in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Court that provides for a sale to any specifically identified Person) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to T-Rex (each, an "Alternative Transaction") or consummates before the Auction the sale from the Trustee to Offshore Energy Holding previously approved by the Court [Docket No. 363], (b) T-Rex is not otherwise in default or breach under the Asset Purchase Agreement, and (c) either (i) T-Rex terminates the Asset Purchase Agreement pursuant to Section 10.1(b)(ii), (iv), or (ix) thereof or (ii) the Trustee terminates the Asset Purchase Agreement pursuant to Section 10.1(c)(ii) or (iv) thereof, then the Trustee shall pay to T-Rex the Break-Up Fee. The Break-Up Fee shall be payable solely from the proceeds of the Alternative Transaction or consummation of the sale from the Trustee to Offshore Energy Holding, L.L.C. previously approved by the Court [Docket No. 363].

9.      The Trustee is authorized and directed to pay the Break-Up Fee to T-Rex in accordance with the provisions of paragraphs 8 of this Order, without further action or order of this Court.

10.     This Order shall be effective and enforceable immediately upon entry.

SIGNED this 16th day of _____August_____, 2010.

THE HONORABLE JEFF BOHM,
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 09-34031-H4-11 |
| | § | |
| GOODCRANE CORPORATION, | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

### TRUSTEE'S EMERGENCY MOTION TO APPROVE (I) SALE PROCEDURE AND FORM OF NOTICE; AND (II) CERTAIN BID PROTECTIONS

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN TWENTY-ONE (21) DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**MOVANT HAS REQUESTED EXPEDITED CONSIDERATION OF THIS MOTION.**

**To the Honorable Jeff Bohm,**
**United States Bankruptcy Judge:**

Janet Northrup, the Chapter 11 Trustee ("Trustee") of the bankruptcy estate of Goodcrane Corporation, a Texas corporation (the "Debtor"), files this Motion to Approve (i) Sale Procedure and Form of Notice; and (ii) Certain Bid Protections.

### Nature of the Motion

1.     The Trustee has entered into a written agreement to sell certain assets and operations of the bankruptcy estate of the Debtor to Texas ReExcavation, LC, a Texas limited

liability company. or to the other parties to which Texas ReExcavation. LC has assigned its rights under the Asset Purchase Agreement (as defined herein) (together with Texas ReExcavation. LC. such parties are referred to herein as "T-Rex"). free and clear of all liens. claims. interests and encumbrances under 11 U.S.C. § 363(f) for a total payment of $6,100,000.00. which will be paid either by (i) cash payment, or (ii) cash payment in an amount equal to $6,100,000.00 less the outstanding balance of all amounts due under a working capital loan not to exceed $250,000.00 to be approved by this Court. The specific terms of the sale are set forth in greater detail below. The agreement between the Trustee and T-Rex is subject to higher and better offers. In order to induce T-Rex to serve as the "stalking horse" bidder in the sale process, the Trustee has agreed to, and seeks approval of a sale procedure and form of notice and certain bid protections as set forth below.

### Background

2.      On June 5. 2009. the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On June 30, 2009. the Court ordered the appointment of a chapter 11 trustee (docket no. 31). On July 2, 2009, the Court entered an order appointing the Trustee (docket no. 36).

3.      The Debtor is in the business of designing and manufacturing cranes and deck equipment for marine offshore applications. The Debtor's operations have continued under the direction of the Trustee and the Court-appointed Chief Restructuring Officer.

4.      Since her appointment, the Trustee, with the help of the Chief Restructuring Officer, has explored various available options for selling the Debtor's assets. Significant discussions occurred with several interested purchasers. These efforts resulted in Court approval of (i) bid procedures providing for notice and an auction [Docket No. 319] and (ii) a sale of

1748391-1:GCRANE:0002                    2

substantially all the assets of the Debtor to Offshore Energy Holding. L.L.C. ("Offshore")

[Docket No. 363]. Offshore failed and refused to close on the purchase of assets. After Offshore

failed to close. the Trustee and the Chief Restructuring Officer also spent time negotiating with

and providing information to other potential buyers. in an effort to mitigate the substantial

damages caused to the estate by Offshore's breach of contract. After negotiation with several

parties, the Trustee entered into an "Asset Purchase Agreement" with T-Rex. The Asset

Purchase Agreement is attached as **Exhibit 1**. The Asset Purchase Agreement is subject to

higher and better offers. Under the Asset Purchase Agreement, the Trustee has agreed to seek

approval. on an expedited basis, of substantially the same sale procedure and form of notice as

were previously approved by the Court in connection with the sale to Offshore [Docket No. 319],

and certain bid protections for T-Rex. all as more fully set forth below.

     5.    Contemporaneous with this motion. the Trustee is filing a motion to sell certain

assets and operations of the Debtor under § 363(f) of the Bankruptcy Code pursuant to the terms

set forth in the Asset Purchase Agreement (the "Sale Motion").

**The Sale Procedure and Form of Notice**

     6.    The Trustee seeks approval of the following sale procedure and form of notice, to

be used in the event Offshore continues to refuse to close the sale previously approved by the

Court [Docket No. 363] at or before the Auction:

> **Notice of Sale Hearing**. On the first business day following the entry of an order
> approving this motion, the Trustee will serve by first class mail a notice
> containing the date of the final sale hearing to: (i) all potential purchasers
> previously identified or solicited by the Trustee during this bankruptcy case; (ii)
> all other potentially interested parties identified by the Trustee (with input from
> the Official Committee of Unsecured Creditors (the "Committee")) in her
> business judgment as a potential purchaser (collectively, with the parties
> identified in (i) above, the "Potential Purchasers"); (iii) the Office of the United
> States Trustee; (iv) counsel for T-Rex; (v) counsel for the Committee, (vi) all
> parties who are known to possess or assert a lien, claim, encumbrance or interest
> in or upon any of the Purchased Assets (as defined in the Asset Purchase

Agreement); (vii) all applicable United States, state and local regulatory or taxing authorities, recording offices or any governmental entity which have a reasonably known interest in the relief requested in the Sale Motion; and (viii) all parties on the most current master service list filed in this case.

**Qualified Bidders**. Only Qualified Bidders may participate in the bidding process. To become a Qualified Bidder, a potential bidder must on or before 5:00 p.m. Central Time on August 31, 2010 (i) execute and deliver to the Trustee a confidentiality agreement prepared by the Trustee and approved by T-Rex, (ii) deposit with the Trustee the sum of $200,000.00 (each, the "Alternative Buyer's Deposit") which deposit shall be nonrefundable unless such Qualified Bidder is not the highest and best offer as determined by the Court; (iii) submit to the Trustee an unqualified and binding cash bid of at least $6,300,000.00 along with an executed written agreement substantially in the form of the Asset Purchase Agreement as determined by the Trustee ("Qualified Bids"); *provided however,* Offshore shall not be required to re-execute and deliver an Asset Purchase Agreement because it has previously executed and delivered an Asset Purchase Agreement approved by the Court [Docket No. 363] and *further provided* that the Trustee may consummate the sale to Offshore before the Auction; and (iv) provide financial and other information to the Trustee and the Committee that allow the Trustee and the Committee to make a reasonable determination as to such bidder's ability to consummate a sale as contemplated herein. T-Rex is and shall be deemed to be a Qualified Bidder and a party in interest for all purposes. If no other Qualified Bidders are identified, the Asset Purchase Agreement between the Trustee and T-Rex shall be deemed the Highest and Best Bid (as defined below). No letter of intent or other written proposal submitted to the Trustee prior to the filing of this motion by any party other than T-Rex shall constitute or be considered a Qualified Bid for purposes of these sale procedures. The Trustee, in consultation with the Committee, shall be responsible for conducting the bid and sale process.

**Notice of Qualified Bidders**. On or before 5:00 p.m. Central Time on September 1, 2010, the Trustee shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received. All information received by the Trustee shall be shared with counsel for the Committee and counsel for T-Rex. The Trustee shall serve a copy of the notice and the corresponding bids on all Qualified Bidders by (a) facsimile or electronic mail or (b) overnight delivery.

**Auction**. If one or more timely Qualified Bids are received, an auction for the Purchased Assets will be conducted on September 2, 2010, commencing at 10:00 a.m. Central Time at the offices of Wayne Kitchens, Hughes, Watters & Askanase, L.L.P., 333 Clay, 29th Floor, Houston, Texas 77002. Only Qualified Bidders may participate in the auction. All Qualified Bidders, or their authorized representatives, must be physically present or present via teleconference at the auction. At the commencement of the auction, the Trustee shall announce the bidding order, which shall be based on: (i) the amount of the Qualified Bidder's

bid (from low to high); and (ii) if Qualified Bids are identical, the time the Qualified Bids were delivered to the Trustee (the first such received identical bid going first in the auction); *provided, however,* that T-Rex shall bid last in any bidding round in which it participates.  Minimum overbid increments at the auction shall be in the amount of not less than $100,000.00.

**Selection of the Highest and Best Bid**.  At the conclusion of the auction, the Trustee will announce the highest and best Qualified Bid (the "Highest and Best Bid") and the next highest and best Qualified Bid (the "Back-Up Bid").  The Trustee will seek approval of the Highest and Best Bid at the final sale hearing.  If for any reason, the Qualified Bidder submitting the Highest and Best Bid fails to timely consummate the purchase of the Purchased Assets, the Trustee may seek to consummate a sale based on the Back-Up Bid without further approval by the Court.  The Back-Up Bid and the obligation of the party submitting such bid to consummate the purchase of the Purchased Assets shall remain open and in full force until the close of a sale of the Purchased Assets to the party making the Highest and Best Bid or the party making the Back-Up Bid.

**Return of Deposits**.  Within two business days after the conclusion of the auction described above, the Trustee shall return by check the full amount of the Alternative Buyer's Deposit submitted by each party that is not selected as submitting the Highest and Best Bid or the Back-Up Bid.  If the sale of the Purchased Assets is consummated with the party submitting the Highest and Best Bid, the Alternative Buyer's Deposit of the party that is declared the Back-Up Bid shall be returned by check transfer within two business days after the closing of the sale to the party submitting the Highest and Best Bid.

7.      The foregoing sale procedure is substantially identical to the sale procedure previously approved by the Court [Docket No. 319], except that the time period between notice and the deadline for Qualified Bids is slightly shortened.  The Trustee submits such shortened time period is appropriate under the circumstances as the procedure has been followed previously and no Qualified Bids (other than Offshore's initial offer) were received and an auction was not required.  This procedure provides an appropriate framework to ensure that the Trustee's goal of obtaining the maximum value for the Purchased Assets is realized, while taking into account the urgent need of the estate to close a sale and stop the ongoing administrative expenses of the Chief Restructuring Officer and operating expenses.  Moreover, T-Rex has demanded certain deadlines in the Asset Purchase Agreement, including that an Order approving

this Motion be entered no later than August 18, 2010 , and that closing of the sale occur no later than October 1, 2010. The proposed process is transparent and represents a fair balance of the competing issues present in this case.

### Requested Break-Up Fee

8.      In connection with the Asset Purchase Agreement, the Trustee seeks approval of a $180,000.00 break-up fee (the "Break-Up Fee"). Specifically, if (a) the Trustee enters into any agreements or arrangements in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Court that provides for a sale to any specifically identified Person) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to T-Rex (each, an "Alternative Transaction") or consummates before the Auction the sale from the Trustee to Offshore previously approved by the Court [Docket No. 363], (b) T-Rex is not otherwise in default or breach under the Asset Purchase Agreement, and (c) either (i) T-Rex terminates the Asset Purchase Agreement pursuant to Section 10.1(b)(ii), (iv), or (ix) thereof or (ii) the Trustee terminates the Asset Purchase Agreement pursuant to Section 10.1(c)(ii) or (iv) thereof, then the Trustee shall pay to T-Rex the Break-Up Fee. The Break-Up Fee shall be payable solely from the proceeds of the Alternative Transaction or consummation of the sale from the Trustee to Offshore previously approved by the Court [Docket No. 363].

9.      The Break-Up Fee is slightly less than 3% of the purchase price of $6,100,000.00 offered by T-Rex. The Court previously approved an almost identical percentage for a break-up

fee of $300,000.00 in connection with a purchase price of $9,100,000.00 offered by Offshore [Docket No. 319], which sale was approved but did not close. The Trustee believes that the Break-Up Fee is appropriate under the circumstances as a cost of ensuring that the Debtor's bankruptcy estate maximizes value for the Purchased Assets, while also providing the Trustee with the opportunity to continue her marketing efforts. The Trustee believes that the amount of the Break-Up Fee is imminently reasonable for a transaction of the type and size contemplated, and is in line with the break-up fee previously approved by the Court [Docket No. 319].

10.     The determination of whether a break-up fee should be allowed is based on whether the fees and expenses are necessary to preserve the value of the estate. *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534 (3d Cir. 1999). Courts have evaluated break-up fee arrangements under the business judgment rule standard. *Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988); *In re Integrated Res., Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed by* 3 F.3d 49 (2d Cir. 1993); *see also In re Twenver, Inc.*, 149 B.R. 954 (Bankr. D. Colo. 1992). The considerations that underlie a debtor's business judgment to pay a break-up fee are relevant to the Court's determination of the request. *Id.*

11.     It is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *In re Integrated Res., Inc.*, 147 B.R. at 658. In the instant case, the proposed break-up fee and bid protections have been the product of good faith, arm's-length negotiations between the Trustee and T-Rex. The proposed fee is within the spectrum of break-up fees approved by bankruptcy courts in chapter 11 cases throughout the country. *See e.g., In re VarTec Telecom, Inc.*, Case No. 04-81694 (SAF) (Bankr. N.D. Tex., November 23, 2004 and April 15, 2005) (court approved a

break-up fee of approximately 3% with respect to two sales of assets); *In re Enron Corp.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y., April 8, 2004) (court approved break-up fee equal to 5% of the purchase price); *In re TransCom USA Management Co., L.P.*, Case No. 01-35158 (KKB) (Bankr. S.D. Tex., February 12, 2002) (court approved a break-up fee of more than 3.6% of the purchase price for the assets); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (court approved a break-up fee of 3.64% or $4,000,000 in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (court approved break up fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *see also Integrated Res.*, 147 B.R. at 648; *In re Crowthers McCall Pattern, Inc.*, 113 B.R. 877, 879 (Bankr. S.D.N.Y. 1990); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); *In re Twenever*, 149 B.R. at 957 (holding a topping fee of 1% to 2% is generally found to be reasonable in a majority of cases approving such fees).

### Request For Expedited Consideration

12.     For the reasons set forth in paragraphs 7 and 9 above, the Trustee requests that the Court give expedited consideration to this Motion so the deadlines set by T-Rex can be met and the ongoing administrative expenses of continuing the Debtor's operations can cease upon conclusion of the sale.

Accordingly, the Trustee requests that the Court (i) approve the motion as set forth above; and (ii) grant the Trustee other just relief.

**Dated: August 16, 2010.**

Respectfully submitted,

HUGHES WATTERS ASKANASE, LLP

By: _Rhonda Chandler_
Wayne Kitchens        TBN 11541110
Rhonda R. Chandler   TBN 04101600
333 Clay Street, 29th Floor
Houston, Texas 77002
Telephone: (713) 759-0818
Facsimile: (713) 759-6834
wkitchens@hwa.com
rchandler@hwa.com
**COUNSEL FOR TRUSTEE**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served on the registered ECF filers listed on the attached service list on August 16, 2010. The other persons listed on the attached service list will be served after the court sets a hearing date for the Sale Motion filed contemporaneously with this Bid Procedures Motion, and a supplemental Certificate of Service will be filed.

_Rhonda Chandler_
Rhonda R. Chandler

## EXHIBIT C

### Sale Motion and Sale Order

See attached.

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 57 of 77

Case 09-34031   Document 454-2   Filed in TXSB on 08/16/10   Page 14 of 20
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 54 of 77

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 09-34031-H4-11 |
| | § | |
| GOODCRANE CORPORATION, | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

### TRUSTEE'S MOTION FOR APPROVAL OF SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES UNDER 11 U.S.C. § 363(f)

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN TWENTY-ONE (21) DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

To the Honorable Jeff Bohm,
United States Bankruptcy Judge:

Janet Northrup, the Chapter 11 Trustee ("Trustee") of the bankruptcy estate of Goodcrane

Corporation, a Texas corporation (the "Debtor"), files this Motion for Approval of Sale of Assets

Free and Clear of Liens, Claims, Interests and Encumbrances Under 11 U.S.C. § 363(f).

### Nature of the Motion

1.       The Trustee seeks approval of a sale of certain assets and operations of the

bankruptcy estate of the Debtor (as described in the Asset Purchase Agreement, the "Purchased

Assets") to Texas ReExcavation, LC, a Texas limited liability company, or to the other parties to

which Texas ReExcavation, LC has assigned its rights under the Asset Purchase Agreement (as

1747619-1:GCRANE:0002

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 58 of 77

Case 09-34031   Document 454-2   Filed in TXSB on 08/16/10   Page 15 of 20
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 55 of 77

defined herein) (together with Texas ReExcavation. LC. such parties are referred to herein as "T-Rex"). free and clear of all liens. claims. interests and encumbrances under 11 U.S.C. § 363(f) other than Permitted Liens (as defined in the Asset Purchase Agreement) for a total payment of $6.100,000.00, which will be paid either by (i) cash payment. or (ii) cash payment in an amount equal to $6.100,000.00 less the outstanding balance of all amounts due under a working capital loan not to exceed $250,000.00 to be separately approved by this Court. The specific terms of the sale are set forth in greater detail below. The agreement between the Trustee and T-Rex is subject to higher and better offers and the bid procedures and protections described in the Trustee's Motion to Approve (i) Sale Procedure and Form of Notice; and (ii) Certain Bid Protections (the "Bid Procedures Motion") filed contemporaneously herewith. In the event that other qualified bids are received pursuant to the procedures set forth in the Bid Procedures Motion. the Trustee seeks to sell the Purchased Assets to the Highest and Best Bid (as defined in the Bid Procedures Motion) in accordance with the Bid Procedures Motion.

## Background

2.      On June 5, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On June 30, 2009, the Court ordered the appointment of a chapter 11 trustee (docket no. 31). On July 2, 2009, the Court entered an order appointing the Trustee (docket no. 36).

3.      The Debtor is in the business of designing and manufacturing cranes and deck equipment for marine offshore applications. The Debtor's operations have continued under the direction of the Trustee and the Court-appointed Chief Restructuring Officer.

4.      Since her appointment. the Trustee, with the help of the Chief Restructuring Officer, has explored various available options for selling the Debtor's assets. Significant discussions occurred with several interested purchasers. These efforts resulted in Court approval

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 59 of 77

Case 09-34031   Document 454-2   Filed in TXSB on 08/16/10   Page 16 of 20
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 56 of 77

of (i) bid procedures providing for notice and an auction [Docket No. 319] and (ii) a sale of substantially all the assets of the Debtor to Offshore Energy Holding. L.L.C. ("Offshore") [Docket No. 363]. Offshore failed and refused to close on the purchase of assets. After Offshore failed to close, the Trustee and the Chief Restructuring Officer also spent time negotiating with and providing information to other potential buyers, in an effort to mitigate the substantial damages caused to the estate by Offshore's breach of contract. After negotiating with several parties, the Trustee entered into an "Asset Purchase Agreement" with T-Rex. A copy of the Asset Purchase Agreement is attached as **Exhibit 1**.

5.     The Asset Purchase Agreement is subject to higher and better offers in accordance with the procedures set forth in the Bid Procedures Motion. Under the Bid Procedures Motion, T-Rex will serve as the "stalking horse" bid and be entitled to certain bid protections, including a $180,000.00 break-up fee, as further described in the Bid Procedures Motion.

<u>Request for Relief and Authority</u>

6.     The Trustee requests that the Court approve the sale of the Purchased Assets to T-Rex (or such other qualified bidder that might be selected by the Trustee in accordance with the Bid Procedures Motion) free and clear of all liens, claims, interests and encumbrances other than Permitted Liens.

7.     In evaluating such a sale, a court must balance the need for flexibility with the concern of affected creditors. *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 715 (Bankr. W.D. Tex. 1989). The Court must also determine that creditors' lien rights are adequately protected and that the offered price is the highest price obtainable under the circumstances in the particular case. *Id.*; *In re Beker Indus. Corp.*, 63 B.R. 474, 477-78 (Bankr. S.D.N.Y. 1986). As set forth above, the Trustee believes that the Purchase Price (as defined in the Asset Purchase Agreement) to be paid by T-Rex (or such bidder submitting a higher and

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 60 of 77

Case 09-34031   Document 454-2   Filed in TXSB on 08/16/10   Page 17 of 20
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 57 of 77

better offer) is a fair price and that a sale in accordance with the Bid Procedures Motion is in the best interest of the Debtor's bankruptcy estate and its creditors.

8.      To the best of the Trustee's knowledge, the only valid and perfected liens (including Permitted Liens) against the Purchased Assets are included on the attached **Exhibit 2**. In addition, certain parties identified on **Exhibit 3** assert liens, claims, interests and/or encumbrances as to some of the Purchased Assets, which liens, claims, interests and/or encumbrances are in bona fide dispute for purposes of § 363(f) of the Bankruptcy Code.  By this motion, the Trustee intends to sell the Purchased Assets free and clear of all liens, claims, interests and encumbrances, including those identified on **Exhibits 2 and 3**, other than Permitted Liens, pursuant to § 363(f), with all valid liens, claims, interests and encumbrances to attach to the net proceeds of the sale with the same validity, enforceability, priority, force and effect that they now have as against the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Trustee and all parties-in-interest with respect to such liens, claims, interests and/or encumbrances.   Any such party holding a lien, claim, interest and/or encumbrance against the Purchased Assets, other than the parties holding Permitted Liens, shall file a pleading with the Court within 30 days of the entry date of an order approving the sale or such lien, claim, interest and/or encumbrance shall be forever waived and discharged.

9.      If the sale is to T-Rex or any other buyer brought to the Trustee by the efforts of Clay Pritchett and Holt Lunsford Commercial ("Holt Lunsford"), the Trustee seeks authority to pay to Holt Lunsford at closing a commission not to exceed six percent (6%) of the sale price attributable to the real property included in the Purchased Assets, pursuant to the Order Granting Application to Employ Real Estate Broker and Agent [Docket No. 257].  If the sale is to a buyer brought to the Trustee by the efforts of Freddie Fredricksen ("Fredricksen"), the Trustee seeks

authority to pay to Fredricksen at closing a commission not to exceed three percent (3%) of the total sale price, pursuant to the Order Approving Employment of Broker [Docket No. 194].

Accordingly, the Trustee requests that the Court (i) approve the sale of the Purchased Assets free and clear of liens, claims, interests and encumbrances under 11 U.S.C. § 363(f) other than Permitted Liens, and other associated relief contained in the proposed form of order filed with this motion; (ii) authorize the Trustee to pay a commission as requested above; (iii) authorize the Trustee to execute all documents necessary to effectuate the sale; and (iv) grant the Trustee other just relief.

Dated: August _____, 2010.

Respectfully submitted,

HUGHES WATTERS ASKANASE, LLP

By: _____
Wayne Kitchens      TBN 11541110
Rhonda R. Chandler  TBN 04101600
333 Clay Street, 29th Floor
Houston, Texas 77002
Telephone:  (713) 759-0818
Facsimile:  (713) 759-6834
wkitchens@hwa.com
rchandler@hwa.com
**COUNSEL FOR TRUSTEE**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served via first class U.S. Mail, postage prepaid, and/or by ECF upon the parties listed on the attached service list on this _____ day of August, 2010.

_____
Rhonda R. Chandler

1747619-1:GCRANE:0002                    5

### Exhibit 1

**Asset Purchase Agreement**

See attached.

<u>Exhibit 2</u>

### Liens Trustee is Authorized to Pay at Closing

Secured claim for ad valorem taxes against the Real Property Purchased Assets and personal property taxes in the aggregate approximate amount of $505,000, the exact amount to be determined prior to Closing.

Secured claim of Texas Workforce Commission in the approximate amount of $48,000, which claim is the subject of the State Tax Lien recorded in/under Clerk's File No. 20090074649 in the Real Property Records of Harris County, Texas.

Potential secured claim with respect to a federal tax lien for Section 941 taxes for the period ended 6/30/07, in the approximate amount of $1200.

Secured super-priority lien in favor of Karl Winter in the approximate amount of $300,00, plus interest [Docket No. 435]

## Exhibit 3

### Disputed Liens, Claims, Interests and Encumbrances

CVI Global Lux Oil and Gas S.A.R.L.

Constructiones Integrales del Carmen. S.A. de C.V. (CICSA Marine)

Stemen Environmental, Inc.

Praxair Distribution, Inc.

Oceanografia S.A. de C.V.

ABC&P, LLC

Benjamin Almeda, Jr.

Corazon Almeda

Patrick Almeda

Maria Victoria Almeda

Benjamin Almeda III

Nancy Almeda

Cielito Almeda

Aurora Almeda

Oceaneering International, Inc.

Product Handling Design, Inc.

Trico Marine Services, Inc.

Lauritzen Tankers, A.S.

American Steel Building Company, Inc.

1747619-1:GCRANE:0002
Exhibit 3

**EXHIBIT D**

**Form of Bill of Sale**

See attached.

Exhibit D

EXHIBIT D

## BILL OF SALE

This BILL OF SALE (this "Bill of Sale"), is executed and delivered as of _____. 2010. by Janet Northrup ("Seller"). acting solely in her capacity as the duly appointed Chapter 11 Trustee of Goodcrane Corporation. a Texas corporation. and Texas ReExcavation. LC. a Texas limited liability company ("Buyer").

## RECITALS

WHEREAS. Buyer and Seller have entered into that certain Asset Purchase Agreement dated the date hereof (the "Purchase Agreement"), pursuant to which Seller has agreed to sell, transfer. convey. assign and deliver to Buyer all of its rights, title and interest in, to and under the Purchased Assets free and clear of all Liens, other than Permitted Liens, and Buyer has agreed to purchase the Purchased Assets from Seller, subject in all respects to the terms and conditions of the Purchase Agreement;

WHEREAS. as consideration for the conveyance of the Purchased Assets, Buyer has paid the Purchase Price to Seller: and

WHEREAS, Seller desires to deliver to Buyer such instruments of sale. conveyance, assignment. transfer and delivery as shall be effective to vest in Buyer all right. title and interest in and to the Purchased Assets.

NOW. THEREFORE. for the consideration set forth in the Purchase Agreement and other good and valuable consideration. the receipt and sufficiency of which are hereby acknowledged. Buyer and Seller agree as follows:

Section 1. Defined Terms. All initially capitalized terms used but not defined herein have the meanings given them in the Purchase Agreement.

Section 2. Transfer of Purchased Assets. On the terms and subject to the conditions set forth in the Purchase Agreement, Seller hereby sells, assigns. transfers, conveys and delivers to Buyer. and its successors and assigns, all of Seller's right, title and interest in, to and under the Purchased Assets free and clear of all Liens, other than Permitted Liens. TO HAVE AND TO HOLD. all and singular, the Purchased Assets of Seller unto Buyer and for Buyer's benefit and use. Seller does hereby bind itself and its successors to warrant and forever defend, all and singular, title to the Purchased Assets granted unto Buyer, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof, by or through such Seller. subject to the terms and conditions of the Purchase Agreement.

Section 3. No liability. Buyer does not assume and shall have no liability whatsoever with respect to any liability or any obligation of Seller, or its affiliates, whether known or unknown, disclosed or undisclosed, matured or unmatured, contingent or otherwise related to the Purchased Assets of Seller.

Section 4. Further Assurances. If Buyer determines that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable to vest. perfect or confirm ownership (of record or otherwise) in Buyer (or its

designee). its rights. title or interest in. to or under any or all of the Purchased Assets. Seller will execute and deliver all deeds. bills of sale. instruments of conveyance. powers of attorney. assignments and assurances and take and do all such other actions and things as may be reasonably requested by Buyer (or its designee) in order to vest. perfect or confirm any and all right. title and interest in. to and under such rights. properties or assets in Buyer. in each case at Buyer's cost and expense.

Section 5. <u>Binding on Successors: No Third Party Beneficiaries</u>. The provisions of this Bill of Sale will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Notwithstanding anything to the contrary contained in this Bill of Sale. nothing in this Bill of Sale, express or implied, is intended to confer on any Person, other than the parties hereto or their respective successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Bill of Sale.

Section 6. <u>Waivers</u>. None of the provisions of this Bill of Sale may be waived, changed or altered except in a signed writing by the party against whom enforcement of the same is sought.

Section 7. <u>Counterparts</u>. This Bill of Sale may be executed by the parties hereto in any number of counterparts (including by facsimile or Portable Document Format (PDF) transmission). each of which so executed and delivered will be an original. with the same effect as if the signature thereto were upon the same instrument. Each counterpart may consist of copies hereof each signed by one. but together signed by all of the parties. An electronic copy of a signature page will be deemed to be an original signature page.

Section 8. <u>Governing Law</u>. This Bill of Sale will be governed by and construed in accordance with the laws of the State of Texas. without regard to its conflict of laws principles.

[*Signature page follows*]

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 68 of 77

Case 09-34031   Document 454-3   Filed in TXSB on 08/16/10   Page 5 of 17
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 65 of 77

IN WITNESS WHEREOF, the undersigned hereby execute this Bill of Sale as of the day
and year first above written.


BUYER:

TEXAS REEXCAVATION, LC
a Texas limited liability company


By:_____
Name: Robert K. Hillin, Jr.
Title:_____


SELLER:


By:_____
    JANET NORTHRUP, acting solely in her
    capacity as the CHAPTER 11 TRUSTEE OF
    GOODCRANE CORPORATION


[Signature Page to Bill of Sale]

**EXHIBIT E**

**Form of Assignment and Assumption Agreement**

See attached.

143269_1.DOC

Case 09-34031   Document 454-3   Filed in TXSB on 08/16/10   Page 7 of 17
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 67 of 77
EXHIBIT E

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed and delivered as of _____ ____, 2010. by and between Janet Northrup ("Seller"). acting solely in her capacity as the duly appointed Chapter 11 Trustee of Goodcrane Corporation. a Texas corporation ("Debtor"). and Texas ReExcavation. LC. a Delaware limited liability company ("Buyer").

### RECITALS

WHEREAS. on the terms and subject to the conditions of the Asset Purchase Agreement dated as of August ____, 2010, by and between Buyer and Seller (as modified, amended or supplemented, the "Asset Purchase Agreement"), Seller agreed to, at the Closing, sell, assign, transfer, convey and deliver to Buyer all of Seller's right, title and interest in, to and under the Purchased Assets free and clear of all Liens, other than Permitted Liens, and Buyer agreed to, at the Closing, assume only those liabilities associated with the Purchased Assets arising on or after the Closing Date.

NOW. THEREFORE. for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. and intending to be legally bound hereby, the parties agree as follows:

Section 1.     Defined Terms. All initially capitalized terms used but not defined herein have the meaning given them in the Asset Purchase Agreement.

Section 2.     Assignment of Purchased Contracts and Post-Agreement Contracts. On the terms and subject to the conditions set forth in the Asset Purchase Agreement. Seller hereby sells. assigns. transfers. conveys and delivers to Buyer, and its successors and assigns. all of Seller's right. title and interest in, to and under the Purchased Contracts and the Post-Agreement Contracts, free and clear of all Liens. other than Permitted Liens.

Section 3.     Assumption of Liabilities Arising On or After the Closing Date. On the terms and subject to the conditions set forth in the Asset Purchase Agreement. Buyer hereby assumes all of the liabilities and obligations under the Purchased Contracts and the Post-Agreement Contracts arising on or after the Closing Date. For the avoidance of doubt, Seller and Buyer agree that Buyer shall perform all future obligations of Debtor under each of the Crane Contracts but that Buyer is not assuming any liabilities of Debtor or Seller (i) arising from any breach of the Crane Contracts; or (ii) otherwise arising under the Crane Contracts prior to the Closing Date.

Section 4.     Binding on Successors; No Third Party Beneficiaries. The provisions of this Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns. Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement. expressed or implied. is intended to confer on any Person, other than the parties to this Agreement or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 71 of 77

Case 09-34031   Document 454-3   Filed in TXSB on 08/16/10   Page 8 of 17
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 68 of 77

Section 5.    Counterparts.  This Agreement may be executed by the parties hereto in any number of counterparts. each of which when so executed and delivered will be an original. with the same effect as if the signature thereto were upon the same instrument. Each counterpart may consist of a number of copies hereof each signed by one. but together signed by all of the parties.  An electronic copy of a signature page will be deemed to be an original signature page.

Section 6.    Governing Law.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES.

*{Remainder of Page Intentionally Left Blank}*

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 72 of 77

Case 09-34031   Document 454-3   Filed in TXSB on 08/16/10   Page 9 of 17
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 69 of 77

IN WITNESS WHEREOF. the undersigned hereby execute this Agreement the day and year first above written.

BUYER:

TEXAS REEXCAVATION. LC
a Texas limited liability company

By:_____
Name: Robert K. Hillin, Jr.
Title:_____

SELLER:

By:_____
JANET NORTHRUP. acting solely in her
capacity as the CHAPTER 11 TRUSTEE OF
GOODCRANE CORPORATION

[Signature Page to Assignment and Assumption Agreement]

**EXHIBIT F**

**Form of Special Warranty Deed**

See attached.

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 74 of 77

Case 09-34031   Document 454-3   Filed in TXSB on 08/16/10   Page 11 of 17
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 71 of 77

EXHIBIT F

## SPECIAL WARRANTY DEED

| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF HARRIS | § | |

Pursuant to the Order of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, entered on or about _____ (the "Order") in *In re: Goodcrane Corporation*, Case No. 09-34031-H4-11; in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, a copy of which is attached hereto as Exhibit "C" and incorporated herein, Janet Northrup, acting solely in her capacity as Chapter 11 Trustee for Goodcrane Corporation ("Trustee"), and ABC&P, LLC (collectively, "Grantor"), for and in consideration of the sum of TEN DOLLARS ($10.00) cash, and other good and valuable consideration paid to Grantor by Texas ReExcavation, LC ("Grantee") whose address is 3025 Maxroy Street, Houston, Texas 77008, the receipt and sufficiency of which are hereby fully acknowledged and confessed, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee, that certain real property located in Harris County, Texas (the "Land"), being more particularly described by metes and bounds on Exhibit "A" attached hereto and made part hereof for all purposes, together with any and all improvements situated on the Land and all of Grantor's right, title and interest, if any, in and to (i) all rights of way or use, tenements, hereditaments, appurtenances, and easements now or hereafter pertaining to the Land, including, but not limited to, the strips and gores between the Land and abutting properties and in any street, road, highway, alley, easement or right of way, existing or proposed, on or adjacent to the Land, (ii) all utility capacity, water rights and all other entitlements, permits, authorities, approvals, licenses, consents and/or bonds, if any, pertaining to the Land, (iii) all rights of ingress and egress thereto, and (iv) all other rights and benefits attributable to the Land (all of which are hereinafter collectively called the "Property").

This conveyance is made and accepted subject to those certain matters set forth on Exhibit "B" attached hereto and made a part hereof for all purposes.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto said Grantee, its successors and assigns forever; and Grantor does hereby bind Grantor and Grantor's successors to WARRANT AND FOREVER DEFEND all and singular the Property unto said Grantee, and Grantee's successors and assigns, against every person whomsoever claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject only to the matters set forth in this Deed.

Ad valorem taxes and assessments attributable to the year 2010 have been prorated between Grantor and Grantee as of the date of this Special Warranty Deed, and Grantee assumes the payment of such taxes for the current and all subsequent years. Ad valorem taxes and assessments which have been assessed against the Property for the year 2009 and prior years have been paid in full by Grantor. This conveyance is also made subject to, and Grantee assumes the payment of, all subsequent assessments (and any interest and penalties thereon) for the current and prior years for any reason, including assessments due to the change in ownership or due to any change in use by Grantee.

1748402-1:GCRANE:0002

Case 09-34031   Document 494-1   Filed in TXSB on 09/03/10   Page 75 of 77

Case 09-34031   Document 454-3   Filed in TXSB on 08/16/10   Page 12 of 17
Case 09-34031   Document 449-2   Filed in TXSB on 08/16/10   Page 72 of 77

TRUSTEE AND GRANTEE ACKNOWLEDGE AND AGREE THAT JANET NORTHRUP, TRUSTEE, HAS ACQUIRED SUCH PARTY'S INTEREST IN THE PROPERTY IN THE CAPACITY OF BANKRUPTCY TRUSTEE, AND CONSEQUENTLY HAS LITTLE, IF ANY, KNOWLEDGE OF THE PHYSICAL OR ECONOMIC CHARACTERISTICS OF THE PROPERTY.   TRUSTEE HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING (i) THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, AND THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH GRANTEE MAY ELECT TO CONDUCT THEREON, AND THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON OR COMPLIANCE WITH ALL APPLICABLE LAWS, RULES OR REGULATIONS; (ii) EXCEPT FOR ANY WARRANTY OF TITLE CONTAINED IN THIS DEED, THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION, MINERAL, ROYALTY OR OTHERWISE; AND (iii) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY.

GRANTEE ACKNOWLEDGES THAT IT HAS INSPECTED THE PROPERTY AND GRANTEE HAS RELIED SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED BY TRUSTEE.   GRANTEE FURTHER ACKNOWLEDGES THAT THE INFORMATION PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND TRUSTEE (1) HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION; AND (2) DOES NOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" BASIS, AND GRANTEE EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF TRUSTEE HEREIN, EXCEPT AS OTHERWISE SPECIFIED HEREIN, TRUSTEE MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT OF THE PROPERTY.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, this Special Warranty Deed is executed to be effective the ____ day of _____, 2010.

GRANTOR:

_____
JANET NORTHRUP, acting solely in her capacity as the CHAPTER 11 TRUSTEE OF GOODCRANE CORPORATION

THE STATE OF TEXAS     §
                       §
COUNTY OF HARRIS       §

The foregoing instrument was acknowledged before me on this _____ day of _____, 2010, by Janet Northrup, acting solely in her capacity as the Chapter 11 Trustee of Goodcrane Corporation, on behalf of said bankruptcy estate.

_____
NOTARY PUBLIC, in and for
THE STATE OF TEXAS

1748402-1:GCRANE:0002                    3

ABC&P, LLC


By:_____
Name:_____
Title:_____


THE STATE OF _____ §
                       §
COUNTY OF _____ §

    The foregoing instrument was acknowledged before me on this _____ day of _____,
20____, by _____, the _____ of
_____, a _____, on behalf of said
_____.


_____
NOTARY PUBLIC, in and for
THE STATE OF _____


**AFTER RECORDING,
PLEASE RETURN TO:**

Daniel W. Woods
9 Greenway Plaza, Suite 3050
Houston 77046


1748402-1:GCRANE:0002                              4